BARBARA BARNARD *v.* DAVID C. BARNARD
(13822)

HEALEY, SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued December 8, 1989—decision released February 27, 1990

*Gaetano Ferro,* with whom, on the brief, was *Gina Pasquini,* for the appellant (defendant).

*Ernest N. Abate,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. On February 4, 1986, the parties' marriage was dissolved by a judgment that incorporated the provisions of a twenty-one page separation agreement (agreement) of the parties, also dated February 4, 1986. On December 1, 1988, the defendant husband filed a motion for interpretation or clarification of that agreement maintaining that the parties were unable to agree upon the interpretation of Article III of that agreement. That article is captioned "Alimony and Support and Education." The trial court, *Nigro, J.,* held a hearing[1] on this motion. The defendant has appealed from the trial court's interpretation of Article III. Pursuant to Practice Book § 4023, we transferred the case to this court.

---

[1] At the hearing, the trial court, *Nigro, J.,* inquired whether the parties wished to offer any evidence. The defendant indicated that he wished to do so. The plaintiff objected. No evidence was taken.

Initially, it is useful to set out certain background gleaned from the record. At the time of the dissolution, the parties had two children: Amy, born July 25, 1967, and Brett, born April 2, 1971. At that time, Amy was in her freshman year at Tufts University and Brett was attending a private secondary school. At the time of the hearing on the defendant's motion on January 23, 1989, Amy was a senior at Tufts University and she planned to go to law school in the fall of 1989.[2] At that time, Brett was a senior at the Loomis-Chaffee School in Windsor and was going to college in the fall of 1989. The plaintiff wife had remarried on June 20, 1987, approximately one year and four months after the date of the dissolution.

The agreement encompasses eighteen "Articles," some of which are divided into numbered paragraphs. Article III, upon which the parties have focused, is divided into ten numbered paragraphs,[3] some of which,

---

[2] The plaintiff's brief filed in this court states that Amy is now attending Georgetown University School of Law as a first year student and that Brett is a freshman at Boston University.

[3] Article III provides in full: "ALIMONY AND SUPPORT AND EDUCATION

"3.1 During the lifetime of the Husband and until the death or remarriage of the Wife or until ten (10) years from the date of the entry of a final decree of dissolution, whichever shall first occur, subject to the terms of this entire agreement, the Husband shall pay to the Wife the sum of THIRTY THREE THOUSAND SIX HUNDRED DOLLARS ($33,600.00) per year as alimony which shall be considered periodic payments intended to be included in the income of the Wife within the meaning and intent of the Internal Revenue Code and deductible from the Husband's income pursuant to the provisions of the Code and which shall be payable in 12 installments which shall cumulatively average $2,800 per month. During those months of the year when Social Security is deducted from the Husband's salary, the payment shall be less than $2,800/month and when Social Security is no longer deducted from the Husband's salary, then the payment shall be in excess of $2,800/month but in no event shall the amount paid to the Wife be less than $2,400/month. Said payments to commence upon the final decree of dissolution and shall continue for six years from said date. Seventy-three months from the date that said payments commence, and ending 10 years from the date that they commence, Husband

in turn, are further subdivided into subparagraphs. As will be seen below, the defendant's obligations concerning the education and support of the Barnard children, that are at issue here, varied depending upon whether he was paying alimony. Paragraphs 3.4 through 3.8 set out those obligations when he was paying alimony.

shall pay the Wife the sum of $21,600/annum in 12 monthly installments which are alimony adjusted for Social Security as above provided.

"3.2 The Husband shall quit-claim to the Wife all of his right, title and interest in and to their residence located at 62 Old Branchville Road, Ridgefield, Connecticut, subject only to two mortgages encumbering said premises, current taxes and other encumbrances against said premise existing as of the date of acquisition thereof by the parties. The Husband acknowledges that he has no interest in Palmas del Mar and confirms the Wife's title thereto.

"3.3 The Wife shall pay the Husband the sum of SEVENTEEN THOUSAND FIVE HUNDRED DOLLARS ($17,500.00) within two (2) weeks of the entry of said decree and the sum of TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,500.00) together with interest thereon at the rate of 10% per annum, on June 30, 1989 or sooner upon the sale of the premises or remarriage of the Wife.

"3.4 The Wife shall pay the total cost of the private preparatory school education of Brett David Barnard should he attend the same. The term 'total cost' as used in this agreement shall include but shall not be limited to tuition, room, board, books, equipment, clothes, transportation, health care and allowances. The Wife further agrees she will pay for allowances and other costs of support of Brett while he is not in school.

"3.4 (a) So long as the Husband is paying alimony to the Wife, the Wife acknowledges that she will be paying the entire support obligation for the minor son, BRETT.

"3.5 The Husband shall continue to pay the total cost of the private college education of Amy Larkin Barnard at Tufts University through her freshman year, and the total cost of her college education, not to exceed such total cost at the University of Connecticut during her sophomore, junior and senior years. Said obligation shall continue until Amy receives her degree from college but in no event beyond June 30, 1990.* Husband shall furnish to Amy an allowance during the period of time she is in full time attendance at school. The amount of such allowance at such time shall be determined by the Husband and daughter. The criteria for said allowance shall be the daughter's reasonable needs and the husband's ability to pay said allowance.

"3.6 The Husband shall pay the total cost of the college education of Brett David Barnard, not to exceed such total cost at the University of Connect-

Paragraph 3.10, however, concerned the defendant's obligations to pay for such education and support in the event his obligation to pay alimony terminated for any reason, except his death, within five years of the date of the dissolution decree.

icut during his junior and senior years. Said obligation shall continue until Brett receives his degree from college but in no event beyond June 30, 1994. Husband shall furnish to Brett an allowance during the period of time he is in full time attendance at school only. The amount of such allowance shall be determined by the Husband and son. The criteria for said allowance shall be the son's reasonable needs and the husband's ability to pay said allowance.

"3.7 The Husband further agrees to pay for the post graduate education of said children in accordance with his financial abilities to do so at the time of their election to obtain such education. In no event shall such obligation extend beyond three (3) years after their graduation from an undergraduate school.

"3.8 The Husband's obligation to provide education to his children as limited above is predicated upon his present disposable income. In the event that the same shall increase substantially because of the remarriage of the Wife or in a manner unforeseen at the time of entering this agreement, then in that event the obligation of the parties to pay for expenses of education as set forth in paragraphs 3.4, 3.5, 3.6 and 3.7 shall be reviewed to be brought into line with the Husband's ability to pay.

"* In the event the wife is remarried and there are two children in college at the same time, the husband agrees that he will contribute to the educational expense at a total cost for each child not to exceed such total cost at the University of Connecticut.

"3.9 In the event that the parties cannot agree upon the Husband's obligation or abilities under this Article III, either party may petition the Superior Court, Judicial District of Stamford/Norwalk, for a determination of the same, and this agreement shall be deemed to have been amended in accordance with and to the extent of any finding and order of said Court.

"3.10 In the event that the Husband's obligation to pay alimony to the Wife shall terminate for any reason except for his death, within five (5) years from the date of the entry of said decree, the Husband's obligation to provide education for his children shall be amended as follows:

"If within two (2) years, the Husband shall pay the total cost of the said private preparatory school education of Brett, the total cost of his private college education for four (4) years, provided said total cost does not exceed that of such education at Tufts University or at any 'Ivy League' college, and the cost of his support or maintenance, including, but not limited to, food, housing, clothes, transportation, health care and allowances during the period of each year when Brett shall be a fulltime student but shall not be in attendance at said school or college and the total cost of his post gradu-

Paragraph 3.4 of Article III provides that the plaintiff must pay the "total cost of the private preparatory school education" of her son, Brett, as "total cost" was defined in that paragraph.[4] It also provides that so long as the defendant was paying alimony to the plaintiff, she acknowledged that she would be paying the entire support obligation for Brett. Paragraph 3.5 provides, inter alia, that the defendant was "to continue to pay the total cost of the private college education of Amy [his daughter] . . . at Tufts University through her freshman year, and the total cost of her college education, not to exceed such total cost at the University of Connecticut, during her sophomore, junior and senior years. Said obligation shall continue until Amy receives her degree from college but in no event beyond June 30, 1990.* . . ." The asterisk refers to a footnote to paragraph 3.5 and that footnote has been the subject of con-

---

ate education, but not beyond four (4) years after his graduation from college and in no event beyond June 30, 1999.

"In addition the Husband shall pay the total cost of the private college education of Amy Larkin Barnard at Tufts University or similar private college, should she elect to attend the same, and the total cost of her post graduate education, but not beyond four (4) years after her graduation from college and in no event beyond June 30, 1995.

"If within three (3) years, the Husband shall pay all of the education costs provided for by reason of termination of alimony within two (2) years except that his obligation to pay for a post graduate education for Brett shall be limited to two (2) years and shall in no event continue beyond June 30, 1997.

"If within four (4) years the Husband shall pay all of the education costs provided for by reason of termination of alimony within three (3) years except that he shall have no obligation to pay for Brett's post graduate education and his obligation to provide him with an education shall in no event continue beyond June 30, 1995.

"If within five (5) years the Husband shall pay all of the education costs provided for by reason of termination of alimony within four (4) years except that his obligation to pay for a post graduate education for Amy shall be limited to two (2) years and shall in no event continue beyond June 30, 1993."

[4] This paragraph specifically provided: "The term 'total cost' *as used in this agreement* shall include but shall not be limited to tuition, room, board, books, equipment, clothes, transportation, health care and allowances." (Emphasis added.)

flicting interpretations by the parties. This footnote provides: "In the event the wife is remarried and there are two children in college at the same time, the husband agrees that he will contribute to the educational expense at a total cost for each child not to exceed such total cost at the University of Connecticut."

Paragraph 3.6 provides that the "Husband shall pay the total cost of the college education of Brett . . . not to exceed such total cost at the University of Connecticut during his junior and senior years. Said obligation shall continue until Brett receives his degree from college but in no event beyond June 30, 1994. . . ." Paragraph 3.7 provides that the "Husband further agrees to pay for the post graduate education of said children in accordance with his financial abilities to do so at the time of their election to obtain such education. In no event shall such obligation extend beyond three (3) years after their graduation from an undergraduate school."

Paragraph 3.8 provides: "The Husband's obligation to provide education to his children as limited above is predicated upon his present disposable income. In the event that the same shall increase substantially because of the remarriage of the Wife or in a manner unforeseen at the time of entering this agreement, then in that event the obligation of the parties to pay for expenses of education as set forth in paragraphs 3.4, 3.5, 3.6 and 3.7 shall be reviewed to be brought into line with the Husband's ability to pay."

Paragraph 3.9, which concerns redress to the Superior Court, provides: "In the event that the parties cannot agree upon the Husband's obligation or abilities under this Article III, either party may petition the Superior Court, Judicial District of Stamford/Norwalk, for a determination of the same, and this

agreement shall be deemed to have been amended in accordance with and to the extent of any finding and order of said Court."

Paragraph 3.10, which is the final paragraph set out under Article III, is, in turn, further subdivided into six subparagraphs. Its introductory paragraph states the following: "In the event that the Husband's obligation to pay alimony to the Wife shall terminate for any reason except for his death, within five (5) years from the date of the entry of [this] decree, the Husband's obligation to provide education for his children shall be amended as follows . . . ."

The trial court, in its memorandum, pointed out that the defendant had specifically asked it to determine the extent to which the agreement had fixed his obligation to pay for the postsecondary school education of Amy and Brett. The trial court noted that the footnote to paragraph 3.5 and its effect was at the center of the parties' dispute and particularly the meaning of the term "college" in that footnote. It interpreted the term "college" in the footnote to paragraph 3.5 to mean "four years of undergraduate study," the "standard four-year undergraduate course" and not postgraduate school. In so doing, the trial court rejected the defendant's claim that "college" included "any education after secondary school" including "law school or any other post-undergraduate college education." It supported that conclusion by pointing to other paragraphs of Article III which used such terms as "post graduate education" as in paragraph 3.7. The court referred to paragraph 3.5, determining that the college education in this paragraph involving Amy clearly was intended to mean four years of undergraduate study, to paragraph 3.10 which the trial court said "carefully distinguish[es]" between "private 'college' education" and "post graduate education" and to paragraph 3.6

where it maintained that "college" education, as applied to Brett, could only be read as meaning the four undergraduate years ending with the senior year.

In agreeing with the plaintiff that "college" in the footnote to paragraph 3.5 meant "college" in the four-year undergraduate sense, it also accepted her claim that the defendant's obligations, by virtue of her remarriage, were fixed by paragraph 3.10. In reaching this latter conclusion, it rejected the defendant's claim that paragraph 3.10 must be interpreted to incorporate the footnote to paragraph 3.5, including specifically his claim as to the interpretation of "college" in that footnote to mean any education after secondary education including postgraduate education or law school. The trial court noted that under paragraph 3.10, the defendant assumed "a significantly larger role in meeting the educational costs of his children" should his alimony obligation terminate, as it did. It also determined that paragraph 3.10 did not condition the defendant's obligation upon his ability to pay. It further decided that paragraph 3.9 did not authorize it to modify, in accordance with the defendant's ability to pay, as he contended, his obligations set forth in paragraph 3.10.

In his appeal, the defendant claims that the trial court erred in concluding that his obligation to pay for the postmajority education of his children was not subject to modification and, therefore, further erred in refusing to consider his financial ability to pay for the post-majority education of the Barnard children.

The defendant claims that his financial ability to pay for the postmajority education of the Barnard children is a criterion that pervades Article III of the agreement and for that he refers to paragraphs 3.5 through 3.8 of that article. He contends that upon the plaintiff's remarriage, his obligations to pay for the education and support of the Barnard children are not controlled by

paragraph 3.10 but are limited as set out in the footnote to paragraph 3.5. In addition, he argues that paragraph 3.9 explicitly contemplates and allows recourse to the Superior Court "[i]n the event . . . the parties cannot agree upon [his] obligation or abilities under . . . Article III. . . . " He maintains, nevertheless, that the trial court ignored paragraph 3.9 when it concluded that paragraph 3.10 did not condition his obligation thereunder upon his ability to pay. Thus, he argues, the trial court gave no effect to paragraph 3.9 and rendered it a nullity. By failing to give the required consideration and effect to paragraph 3.9, he contends that the trial court erred in not considering the agreement as a whole and not giving efficacy to each part where appropriate.

In addition, the defendant also claims that the trial court erred in concluding that his obligation to pay for postmajority education of the Barnard children was not subject to modification. He contends that the trial court had jurisdiction to modify payment of educational expenses after a child attains the age of eighteen where the dissolution judgment incorporates an agreement to that effect. The defendant points out that paragraph 3.10 contains varying time intervals at which his obligation under paragraph 3.10 was "triggered," i.e., depending upon whether his obligation to pay alimony terminated. He reasons that, because that obligation could have been triggered "within two (2) years" of the judgment incorporating this agreement, as it was on the plaintiff's remarriage when Brett had not yet attained the age of seventeen, the parties could not have intended that the defendant's financial obligation to Brett should have been nonmodifiable when Brett had not reached his majority. The defendant, therefore, maintains that because paragraph 3.10 contains premajority, as well as postmajority, financial under-

takings by him, it would be "ludicrous" to think that the parties and the court that entered the dissolution judgment *"silently"* intended Article III to be modifiable before the children were eighteen and nonmodifiable thereafter. (Emphasis added.) This, he concludes, is what the trial court did "despite any language [suggesting] such a construction." He urges, therefore, that we set aside the orders of the trial court and remand the matter for further proceedings.

In the present case, the agreement of the parties was ordered incorporated by reference into the dissolution decree. A judgment rendered in accordance with such a stipulation of the parties is to be regarded and construed as a contract. See *Kenworthy* v. *Kenworthy,* 180 Conn. 129, 131, 429 A.2d 837 (1980); *Albrecht* v. *Albrecht,* 19 Conn. App. 146, 152, 562 A.2d 528, cert. denied, 212 Conn. 813, 565 A.2d 534 (1989). The construction of such an agreement by the trial court is subject to our review under the clearly erroneous standard. *Albrecht* v. *Albrecht,* supra; see *Lavigne* v. *Lavigne,* 3 Conn. App. 423, 427, 488 A.2d 1290 (1985).

"A contract is to be construed as a whole and all relevant provisions will be considered together." *Lar-Rob Bus Corporation* v. *Fairfield,* 170 Conn. 397, 407, 365 A.2d 1086 (1976); see *Blatt* v. *Star Paper Co.,* 160 Conn. 193, 200, 276 A.2d 786 (1970); 17 Am Jur. 2d, Contracts § 258. In giving meaning to the terms of a contract, we have said that " 'a contract must be construed to effectuate the intent of the contracting parties.' " *Sturman* v. *Socha,* 191 Conn. 1, 10, 463 A.2d 527 (1983); *Leonard Concrete Pipe Co.* v. *C. W. Blakeslee & Sons, Inc.,* 178 Conn. 594, 598, 424 A.2d 277 (1979); *Ginsberg* v. *Mascia,* 149 Conn. 502, 506, 182 A.2d 4 (1962). In ascertaining intent, "we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to

accomplish." *Connecticut Co.* v. *Division 425,* 147 Conn. 608, 616, 164 A.2d 413 (1960); *Marcus* v. *Marcus,* 175 Conn. 138, 141, 394 A.2d 727 (1978). "The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." *Ives* v. *Willimantic,* 121 Conn. 408, 411, 185 A. 427 (1936); *Leonard Concrete Pipe Co.* v. *C. W. Blakeslee & Sons, Inc.,* supra; *Powel* v. *Burke,* 178 Conn. 384, 387, 423 A.2d 97 (1979). This is so where the parties have their agreement in writing. *Sturman* v. *Socha,* supra; *Robert Lawrence Associates, Inc.* v. *DelVecchio,* 178 Conn. 1, 14, 420 A.2d 1142 (1979). "In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Sturman* v. *Socha,* supra, 10; *Marcus* v. *Marcus,* supra, 141–42; *Sturtevant* v. *Sturtevant,* 146 Conn. 644, 647–48, 153 A.2d 828 (1959). Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. " 'A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings. *Downs* v. *National Casualty Co.,* 146 Conn. 490, 494, 152 A.2d 316 [1959].' " *Collins* v. *Sears, Roebuck & Co.,* 164 Conn. 369, 374, 321 A.2d 444 (1973); see *Reese* v. *First Connecticut Small Business Investment Co.,* 182 Conn. 326, 327, 438 A.2d 99 (1980). With these principles in mind, we turn to the trial court's resolution of the

meaning of "college" in the footnote to paragraph 3.5 of Article III of the agreement. We find no error in the trial court's ruling on that issue.

At the outset, we note that paragraph 3.5, to which the footnote is appended, contains the term "college." Further, we note that paragraph 3.5 itself provides that the defendant "shall continue to pay the total cost of the *private college education* of Amy . . . at Tufts . . . through her freshman year, and the total cost of her *college education* . . . at the University of Connecticut during her sophomore, junior and senior years. Said obligation shall continue until Amy receives her degree from *college* but in no event beyond June 30, 1990.\*'" (Emphasis added.) The references to "college" in paragraph 3.5 are clearly to a standard four year college education. In addition, paragraph 3.6 provides that "the Husband shall pay the total cost of the college education of Brett . . . not to exceed such total cost at the University of Connecticut during his junior and senior years. Said obligation shall continue until Brett receives his degree from *college* but in no event beyond June 30, 1994. . . . " (Emphasis added.) In this context, the terms "college" and "college education" in paragraph 3.6 again clearly apply to a standard four year college education. That the word "college" means just that finds further support in paragraph 3.7 which provides that "[t]he Husband *further* agrees to pay for the *post graduate education* of said children in accordance with his financial abilities to do so at the time of their election to obtain such education. In no event shall such obligation continue beyond three (3) years *after their graduation from an undergraduate school."* (Emphasis added.) This "further" undertaking speaks not to "college," as that term is commonly understood,[5] but,

---

[5] In *In re Kelly's Estate,* 285 N.Y. 139, 141–42, 33 N.E.2d 62 (1941), Chief Judge Irving Lehman had occasion to construe the term "college" in an agreement in which the decedent had agreed to make certain monthly pay-

to use the words of the parties themselves, to "post graduate education," that which comes "after their graduation from an undergraduate school."

The last paragraph of Article III is 3.10 and it is particularly significant on the intent of the parties as to the meaning of "college" in the footnote to paragraph 3.5 in the context of the defendant's claim that his obligation to his children, in the event of the remarriage of the plaintiff, is not controlled by paragraph 3.10 but is limited as set out in this footnote. This paragraph expresses the extent and nature of the defendant's obligations in the event that his obligation to pay alimony terminates for any reason, except his death, within five years from the date of the entry of the dissolution decree. In doing so, it sets out in detail, with reference to each child, what is to occur in the event the defendant's obligation ceases within two years, within three years or within four years. In doing so, it refers, as to Brett, to his "private preparatory school education," "his private college education for four (4) years" and "his post graduate education." Further, as to Amy, it

---

ments so long as his son "shall remain in college." He said: "The word 'college' is not a word of art which, by common understanding, has acquired a definite unchanging significance in the field of education. Its meaning varies with its context. Though at times it is used to denote any institution of higher learning, including institutions for professional or post-graduate study, it is frequently used, perhaps I should say ordinarily used, in this country, to denote, an 'undergraduate' school for instruction in liberal arts *having a course of study commonly requiring four years for completion and leading to a bachelor's degree."* (Emphasis added.) Id.

In *Hacker* v. *Hacker,* 137 Misc. 2d 819, 822, 522 N.Y.S.2d 768 (1987), the court, after quoting Chief Judge Lehman's definition in *In re Kelley's Estate,* said: "It does not appear that the common definition of the term 'college' has changed much since Judge Lehman spoke for the Court of Appeals in 1941."

As a general matter, the New Jersey Supreme Court adopted the definition of "college" as limiting its meaning to undergraduate study leading to a bachelor's degree, finding that to be its meaning in customary usage. *Epstein* v. *Kuvin,* 25 N.J. Super. 210, 213, 95 A.2d 753 (1953); see also *Brown* v. *Brown,* 327 Pa. Super. 45, 51, 474 A.2d 1168 (1984).

refers to her "private college eduation" and her "post graduate education." It is apparent that the parties employed the term "post graduate education" to mean that program of education that followed "college" for each of their children.

The meaning of the term "college," as used in Article III, as intended by the parties, is clear. We agree with the trial court's observation that to read the term "college," as used in the footnote to paragraph 3.5, as the defendant claims, "is a tortured reading of the term in light of its usage in other sections of the agreement." See *Zullo* v. *Smith,* 179 Conn. 596, 601, 427 A.2d 409 (1980); *Leonard Concrete Pipe Co.* v. *C. W. Blakeslee & Sons, Inc.,* supra, 599; *Downs* v. *National Casualty Co.,* supra, 494. The trial court's ruling as to the meaning of "college" in the footnote to paragraph 3.5 was not clearly erroneous.

The defendant also claims that the trial court erred in concluding that his obligation to pay for the postmajority education of the Barnard children was not subject to modification. As indicated, the trial court found that the provisions of paragraph 3.10 were controlling over paragraph 3.9 and that paragraph 3.10 did not condition the defendant's obligations thereunder upon his ability to pay. Moreover, the trial court did not read paragraph 3.9 as authorizing it to modify the obligations in paragraph 3.10 to conform to the defendant's "claimed ability" to pay. We find error in this ruling of the trial court.

"The jurisdiction of the Superior Court as it relates to postmajority child support derives solely from [General Statutes] § 46b-66.[6] See *Kennedy* v. *Kennedy,* [177

---

[6] General Statutes § 46b-66, entitled "Review of agreements; incorporation into decree," provides: "In any case under this chapter where the parties have submitted to the court an agreement concerning the custody, care, education, visitation, maintenance or support of any of their children

Conn. 47, 49–50, 411 A.2d 25 (1979)]." *Albrecht* v. *Albrecht,* supra, 156. Such jurisdiction is limited to the power to approve and incorporate written agreements concerning such support into its orders or decrees and to enforce such written agreements. *Cattaneo* v. *Cattaneo,* 19 Conn. App. 161, 164, 561 A.2d 967 (1989); see *Arseniadis* v. *Arseniadis,* 2 Conn. App. 239, 245, 477 A.2d 152 (1984). Agreements between parties regarding the postmajority education of children are required to be in writing. General Statutes § 46b-66; *Albrecht* v. *Albrecht,* supra, 150–51; *Arseniadis* v. *Arseniadis,* supra, 244. Once the provisions of a separation agreement, including provisions for the postmajority education of children, are incorporated into the dissolution judgment, they can be modified by court order only if the agreement so incorporated does not preclude modification. See General Statutes § 46b-86; *Albrecht* v. *Albrecht,* supra. General Statutes § 46b-86 (a) provides in part that "[u]nless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support . . . may at any time thereafter be . . . modified by a showing of a substantial change in the circumstances of either party."

or concerning alimony or the disposition of property, the court shall inquire into the financial resources and actual needs of the spouses and their respective fitness to have physical custody of or rights of visitation with any minor child, in order to determine whether the agreement of the spouses is fair and equitable under all the circumstances. If the court finds the agreement fair and equitable, it shall become part of the court file, and if the agreement is in writing, it shall be incorporated by reference into the order or decree of the court. If the court finds the agreement is not fair and equitable, it shall make such orders as to finances and custody as the circumstances require. If the agreement is in writing and provides for the care, education, maintenance or support of a child beyond the age of eighteen, it may also be incorporated or otherwise made a part of any such order and shall be enforceable to the same extent as any other provision of such order or decree, notwithstanding the provisions of section 1-1d."

We must now determine whether the agreement of the parties, incorporated in the judgment, precludes modification. We conclude that it does not. The plaintiff's claim that paragraph 3.10 of Article III controls over paragraph 3.9 is rejected. First, she maintains that paragraph 3.9 only applies to those paragraphs of Article III that precede paragraph 3.9, specifically paragraph 3.5, paragraph 3.6, paragraph 3.7 and paragraph 3.8, as it is those paragraphs, she contends, that allow for changes in the defendant's payment obligations and it is only as to those paragraphs that paragraph 3.9 allows either party to petition the court for a determination of the defendant's ability to pay. The plaintiff also argues that paragraph 3.9 has no effect on paragraph 3.10 for the following reasons: (1) paragraph 3.10 establishes the defendant's obligations to pay for the education of the children *after* the plaintiff's remarriage; (2) no part of paragraph 3.10 imposes any condition upon his obligations involving his ability to pay; and (3) paragraph 3.10 follows paragraph 3.9 in Article III.

The circumstances of the placement of paragraphs 3.9 and 3.10 is, of course, not controlling. Intent concerning modification is to be gathered from all of Article III without regard to the order in which its component parts are placed. See *Prescott* v. *Betts,* 81 Fla. 538, 543, 88 So. 385 (1921). In addition, the parties clearly intended that the provisions of paragraph 3.9 apply to all of Article III, as it plainly provided in its introductory language: "In the event that the parties cannot agree upon the Husband's obligations or abilities under this Article III, either party may petition the Superior Court . . . . " The words used by the parties " 'must be accorded their common meaning and usage where they can be sensibly applied to the subject matter of the contract.' *Beach* v. *Beach,* 141

Conn. 583, 589, 107 A.2d 629 [1954]." *Sturtevant* v. *Sturtevant,* supra; see *Marcus* v. *Marcus,* supra, 141–42. This can easily be done in the present case. It is correct that paragraph 3.10 contains no language that imposes any condition upon the defendant's ability to pay or even expressly mentions his ability to pay. It is clear, however, that simply because the plaintiff has remarried and the defendant is thereby relieved of making further alimony payments he will always, for as long as required to do so by the agreement, nevertheless, be financially obligated to meet the costs of the education of the Barnard children. If the parties intended to make paragraph 3.9 inapplicable to paragraph 3.10, the agreement should have so stated; it did not, and, hence, paragraph 3.10, as well as the balance of Article III, is subject to paragraph 3.9. Where parties have their agreement in writing " 'their intention is to be determined from its language and not on the basis of any intention either may have secretly entertained.' " *Sturman* v. *Socha,* supra, 10. Accepting the plaintiff's claim here would render the plain language of paragraph 3.9 meaningless as to paragraph 3.10. "Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible." *Hatcho Corporation* v. *Della Pietra,* 195 Conn. 18, 23, 485 A.2d 1285 (1985). Paragraph 3.9 is not clearly meaningless as it relates to paragraph 3.10. Therefore, the defendant's obligations under paragraph 3.10 are subject to modification and the court erred in concluding otherwise.

It was, therefore, error for the trial court to conclude that the defendant's obligations or abilities to pay post-majority education costs for the Barnard children under paragraph 3.10 were not subject to modification under

the dissolution decree.[7]

There is error, the judgment of the trial court is set aside and the matter is remanded for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.

---

[7] Paragraph 10.1 does not require a different conclusion. That paragraph provides: "The termination date of the Husband's obligation for the payment of alimony, which may occur upon the Husband's death, upon the Wife's death, or upon her remarriage or cohabitation, or ten years from the date of the decree, whichever event shall first occur, shall not be modified by either parties nor shall any decree rendered dissolving the marriage of the parties permit a modification of this agreement, as provided in Section [46b-86] of the General Statutes of Connecticut. Each of the parties shall join in representing to the Court that is is an integral part of their agreement that the provisions relating to precluding a modification are essential to the disposition of this matter and shall jointly request that such decree contain the prohibition against modification as provided herein."

This paragraph is consistent with our determination that paragraph 3.9 controls paragraph 3.10 as well as the remainder of Article III. It is well to note that the question before us is not that of a modification, but, rather, it involves the construction and interpretation of the original written agreement of the parties as that was incorporated in the dissolution decree. General Statutes § 46b-86 (a) proscribes modification "[u]nless and to the extent that the decree precludes modification . . . . " This decree, by virtue of our construction, does *not* preclude modification. The circumstance that paragraph 10.1 stands alone as a separate article of the agreement does not require that its "general" sweep control over the very specific language of paragraph 3.9 which expressly provides for the event "that [the parties] cannot agree upon the Husband's obligations or abilities under this Article III . . . . " The parties obviously contemplated that such an event might possibly occur and they provided for it in the agreement. To suggest, as the plaintiff does in her one brief reference to paragraph 10.1, that paragraph 10.1 bars modification would read paragraph 3.9 out of the agreement, thus making it meaningless. See *Hatcho Corporation* v. *Della Pietra,* 195 Conn. 18, 23, 485 A.2d 1285 (1985). Our determination here is consistent with the view that a contract is to be construed as what may be assumed to have been the understanding and intention of the parties and that intention is to be determined from the language used, according to the situation of the parties and the circumstances of the transaction. *Lar-Rob Bus Corporation* v. *Fairfield,* 170 Conn. 397, 407, 365 A.2d 1086 (1976).

We also note that the trial court's memorandum of decision does not refer to paragraph 10.1 nor is there any reference to paragraph 10.1 in the briefs filed in the trial court by counsel.