[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff has applied to this court for a temporary injunction enforcing a noncompetition agreement with the defendant. The plaintiff claims that the defendant has marketed competitive products and services to its clients in violation of the parties' noncompetition agreement. The defendant asserts that she has not violated the provisions of the agreement and the noncompetition agreement is invalid due to its unreasonableness.
Based on the evidence presented at the hearing on the plaintiffs application for a temporary injunction, I find the following facts. The plaintiff is engaged in the business of offering pharmacy benefit management products and services to employers, unions and third party administrators. The defendant was retained by the plaintiff as an independent broker to market its products and services to prospective clients. Among the services marketed for the plaintiff by the defendant were prescription drug cards and mail order pharmacy services. The parties signed a written agreement dated March 1, 1990 outlining the terms and conditions of their relationship. Paragraph 7 of the written agreement[1] provided that: "Broker shall agree to not market a product or service reasonably determined by ESI to be in competition with ESI's products and services during the term of this Agreement and for a period of two years after termination of this Agreement to any clients of ESI located in New England or elsewhere." "New England" was defined in the agreement as comprising the states of Maine, Vermont, New Hampshire, New York, Connecticut, Massachusetts, and Rhode Island. Paragraph 9 of the agreement further provided that: "Broker agrees and acknowledges that during the term of this agreement, valuable, proprietary and confidential information of ESI shall be made available to Broker. Broker agrees to hold this information confidential, during this agreement and thereafter, except for Broker's reasonable use of this information in the marketing of ESI's products and services in behalf of ESI."
Since approximately 1995, the defendant provided services through a CT Page 13451 business known as Pat Sirowich and Associates, Inc. The plaintiff and the defendant terminated their relationship on December 31, 2000. In October 2001, the defendant's business began using a new name: Pharmacy Benefit Intermediary or "PBIrx." The services offered by PBIrx to third party administrators, employers and unions included the review of existing pharmacy benefit management contracts, the analysis of pharmacy benefit management needs and recommendations regarding pharmacy benefit management products and services. Through PBIrx, the defendant marketed pharmacy benefit management products and services similar to those offered by the plaintiff.
In October 2001, the defendant contacted Bob Soleau, the head of Diversified Group Brokerage, to discuss the pharmacy benefit management services provided by her new company. Diversified Group Brokerage was a third party administrator of pharmacy benefit programs for a large number of employers. The defendant had previously marketed the plaintiffs services and products to Diversified Group Brokerage. Diversified Group Brokerage was still using the plaintiffs services and products at the time it was contacted by the defendant. The defendant subsequently reviewed the pharmacy benefit management contract that Diversified Group Brokerage had with the plaintiff and recommended that Soleau meet with representatives of National Medical Health Card, "NMHC," a pharmacy benefit management services provider and a direct competitor of the plaintiff, to discuss the services and products provided by NMHC. On November 7, 2001, the defendant was present during a meeting in which representatives of NMHC pitched their pharmacy benefit management products and services to Diversified Group Brokerage. Shortly thereafter, Diversified Group Brokerage replaced the plaintiff with NMHC as the provider of pharmacy benefit management services for five of its employers. In addition, Diversified Group Brokerage changed the provider of the pharmacy benefit management services for its own employees from the plaintiff to NMHC.
The defendant subsequently introduced representatives of NMHC to Group Insurance, another third party administrator which had been previously served by the defendant on behalf of the plaintiff and which was a current customer of the plaintiff. Again, the defendant was present during a meeting in which NMHC offered its pharmacy benefit management services to Group Insurance. Soon thereafter, Group Insurance switched a customer of the plaintiff to NMHC.
The plaintiff maintains that the defendant has violated the noncompetition clause of her broker's agreement by marketing to its customers the pharmacy benefit management products and services of its competitors and it seeks an injunction enjoining the defendant from CT Page 13452 continuing to do so. The defendant asserts that she has not violated the terms of the noncompetition clause. She also argues that, should the court agree with the plaintiffs interpretation of the noncompetition clause, the clause is invalid as the breadth of its restrictions is unreasonable. The court finds that the defendant's actions violated the parties' noncompetition agreement and further finds that the agreement's proscriptions are reasonable and valid.
 I Violation of the Non-compete Agreement
The parties offer competing interpretations of the noncompetition clause of their agreement. The resolution of this dispute is governed by well-established principles of contract law.
"A contract is to be construed as a whole and all relevant provisions will be considered together. In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate the intent of the contracting parties. In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish. The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." (Citations and internal quotation marks omitted.) Barnard v. Barnard, 214 Conn. 99, 109-110 (1990).
The defendant first contends that she did not transgress the prohibition on competing with the plaintiff because the activities she undertook did not constitute the marketing of products or services. She asserts that she merely introduced Diversified Group Brokerage and Group Insurance to NMHC, she did not make the presentation and she did not consummate the sale. She asserts that nothing she said caused the two third party administrators to switch pharmacy benefit management services from the plaintiff to NMHC.
The agreement between the plaintiff and the defendant states that "Broker shall agree to not market a product or service reasonably determined by ESI to be in competition with ESI's products and services . . ." (Emphasis supplied.) "In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the CT Page 13453 language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Barnard v. Barnard, supra, 214 Conn. 110.
The defendant's claim that her actions did not involve the marketing of products or services does not comport with the facts. The use of the term "market" in the noncompetition agreement indicates that the parties included in the restriction not just the actual sale of competing products and services but also efforts to promote and effectuate the sale. The actions taken by the defendant were part of an effort to promote the sale of the pharmacy benefit management products and services of NMHC. The purpose of the defendant's initial meeting with Diversified Group Brokerage was to review its pharmacy benefit management contracts and recommend ways to improve its pharmacy benefit management products and services. The defendant met with Soleau, reviewed the contracts and recommended that he meet with representatives of NMHC, a competitor of the plaintiff. The defendant then set up the meeting. She attended two meetings involving representatives of Diversified Group Brokerage and NMHC in which NMHC presented its products and services and extolled their advantages. Shortly after those meetings, Diversified Group Brokerage replaced the pharmacy benefit management services of the plaintiff with those of NMHC for a number of its employers. The entire thrust of the defendant's efforts was the replacement of pharmacy benefit management services and products of the plaintiff with those of its competitor.
The defendant was acting in concert with NMHC in its efforts to sell its products and services to Diversified Group Brokerage. She opened the door for the sale through her initial meeting with Soleau. She facilitated the sale by recommending a meeting with NMHC, arranging two meetings, and attending the presentations by NMHC. She played a key role in assisting NMHC with the sale of its competing products and services because of her prior relationship with Diversified Group Brokerage and her knowledge of the plaintiffs services and products. It is clear from the language of the parties' agreement that it was precisely this type of activity that the parties sought to prohibit when entering into their noncompetition agreement.
The defendant also contends that she did not violate the parties' noncompetition agreement because it does not apply to marketing to third party administrators. The defendant argues that the term "clients" as used in the noncompetition agreement is limited to employers and unions and does not include third party administrators. The defendant's claim is unavailing.
The noncompetition agreement provides that the defendant is prohibited CT Page 13454 from marketing products and services to "clients" of the plaintiff for two years after the termination of the broker's agreement. This language is to be interpreted in the light of the situation of the parties and the circumstances connected with the transaction. Barnard v. Barnard, supra,214 Conn. 110. Given the nature of the pharmacy benefit management business and the defendant's contractual responsibilities, the only reasonable interpretation is that the prohibition on competition was intended to extend to third party administrators.
The defendant was retained by the plaintiff to market pharmacy benefit management products and services to employers, unions and third party administrators. While employees and union members were the ultimate end users of prescription drug cards and mail pharmacy services, employers, unions and third party administrators were the critical intermediaries through which employees and union members were enrolled. Third party administrators were particularly sought after customers. Since they administered the pharmacy benefit programs for multiple employers and unions, successful marketing to third party administrators was an efficient and effective method of enrolling large numbers of employees and union members. Third party administrators were and remain important targets of the parties' marketing efforts.
The supplementary provisions of the parties' broker agreement buttress the view that the term "client" includes third party administrators. Pursuant to the agreement, the defendant was obligated to provide specific pricing to clients, enter into contracts with clients, submit the contracts to the plaintiff for approval and receive commissions based on prescriptions paid by clients. The defendant acknowledged that such pricing was provided to third party administrators, she entered into contracts with third party administrators, she submitted such contracts for approval and commissions were paid to her based on prescriptions submitted through third party administrators. In fact, the commission statements received by the defendant specifically listed third party administrators as "clients." These facts compel the conclusion that third party administrators were treated like clients because they were clients.
In support of her position that third party administrators were not clients under the parties' broker agreement, the defendant offered three documents authored by the plaintiff which do not refer to third party administrators as clients. None of the documents however are relevant to the issue of the meaning of the term client in the parties' broker agreement. All three documents were drafted long after the parties penned their agreement and they concern an unrelated subject matter.[2] None of the documents purport to define the term "client" for purposes of this broker agreement or any other broker agreement nor do they purport to CT Page 13455 deal with the restrictions of a noncompetition clause. The fact that the term client was interpreted differently by one party at a much later time for an entirely different purpose is not evidence of what both parties intended client to mean for purposes of their broker agreement.[3]
The defendant's position that her solicitation of Diversified Group Brokerage did not violate the noncompetition clause because it did not involve "a client" was also undercut by the definition of "client" she professed to subscribe to on the witness stand. At the hearing, the defendant testified that she understood "client" to mean the entity obligated to pay for the prescriptions. She asserted that, since employers or unions and not third party administrators are the parties financially responsible for paying for prescriptions ordered by their employees or members, third party administrators are not clients. Diversified Group Brokerage was in fact obligated under its contract with the plaintiff to pay for ordered prescriptions. Under the defendant's definition, it was a client under her broker agreement.
 II Validity of Non-compete Agreement
The defendant asserts that the noncompetition clause of the broker agreement is invalid on the grounds that (1) its time and geographic limits are overly broad; (2) the degree of protection afforded the plaintiff is unreasonable; and (3) it places unreasonable restrictions on the defendant's ability to pursue her occupation.[4] The defendant's arguments are not persuasive.
The standard for determining the validity of the parties' noncompetiton covenant is undisputed. Essentially, the restrictions contained in a covenant not to compete must be reasonable. Mattis v. Lally, 138 Conn. 51,54 (1951). "In dealing with a restrictive stipulation between an employer and an employee, as in this case, in order that the court may uphold and enforce the restriction, if it is not otherwise contrary to public policy, the court must find that the facts alleged disclose a restriction on the employee reasonably necessary for the fair protection of the employer's business or rights, and not unreasonably restricting the rights of the employee, due regard being had to the interests of the public, and the circumstances and conditions under which the contract is to be performed." (Citations and internal quotation marks omitted.)Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 253 (1919).
The criteria for determining the reasonableness of the noncompetition clause were established by the Connecticut Supreme Court in Scott v.CT Page 13456General Iron Welding Co., 171 Conn. 132 (1976). Robert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 529 (1988) ("Scottv. General Iron Welding Co., 171 Conn. 132 (1976), sets forth the factors relevant to an evaluation of the reasonableness of a covenant not to compete ancillary to an employment agreement.") In Scott, the court decreed that: "In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place, and must be reasonable — that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." (Citations and internal quotation marks omitted.) Scott v. General Iron Welding Co., 171 Conn. 132, 137 (1976).
The Appellate Court has discerned in Scott five actors for determining the validity of a noncompetition restriction: (1) the length of time the restriction is to be in effect; (2) the geographic area covered by the restriction; (3) the degree of protection afforded to the party in whose favor the covenant is made; (4) the restrictions on the employee's ability to pursue his occupation; and (5) the extent of interference with the public's interests. New Haven Tobacco Co. v. Perrelli,18 Conn. App. 531, 533-34 (1989). A covenant not to compete must be reasonable in all five respects. Id., 534. The burden is on the defendant to demonstrate the unreasonableness of the covenant's restrictions.Milaneseo v. Calvanese, 92 Conn. 641, 642 (1918).
The defendant complains that the noncompetiton covenant is unreasonable because it applies a two-year nationwide restriction on her ability to compete with the plaintiff. The plaintiff counters that a two-year ban has been found by the courts to be reasonable and the geographic limitation is appropriate because it is confined to clients of the plaintiff leaving the defendant free to market products and services to a substantial number of other customers.[5]
The parties' covenant not to compete provides that the defendant shall not market competitive products or services "for a period of two years after termination of this Agreement to any clients of ESI located in New England or elsewhere." A two year ban in and of itself is not unreasonable. See Torrrington Creamery, Inc. v. Davenport, 126 Conn. 515
(1940) and Robert S. Weiss Associates, Inc. v. Wiederlight,208 Conn. 525 (1988). CT Page 13457
The heart of the defendant's complaint is not the covenant's time limit. Her concern is that a broad definition of client combined with the covenant's expansive geographic scope places unreasonable restraints upon her. The defendant asserts that interpreting "clients" to include third party administrators means that she will be barred from servicing 90% to 95% of the third party administrators in the United States. She argues that such a ban is unreasonable because she never marketed pharmacy benefit management services to third party administrators outside New England.
The broker's agreement, reasonably read in its entirety, does not impose a nationwide ban on the defendant's post termination activities. A review of paragraph 7, the noncompetiton clause, in conjunction with the surrounding provisions of the broker's agreement indicates that the covenant not to compete is limited to the marketing of competitive services and products to clients of the plaintiff formerly served by the defendant. Since the defendant only served clients in New England, the geographic reach of the noncompetition clause is limited to New England.
The defendant agrees that an understanding of the reach of the covenant not to compete depends on the meaning of the term "clients."[6] The defendant argues that the term is limited to current clients of the plaintiff and excludes its former clients. A review of the entire agreement shows that clients are properly interpreted to mean clients formerly served by the defendant.
Paragraph one of the broker's agreement provides that the defendant will be responsible for marketing to prospective clients in New England.[7] It further states that the defendant could solicit clients outside of New England only with the prior written approval of the plaintiff. These provisions indicate that the parties contemplated that the solicitation by the defendant of clients outside of New England would be the exception, rather than the rule. The defendant never did solicit clients outside of New England on behalf of the plaintiff and never sought written permission to do so. These provisions support a conclusion that the use of the term "or elsewhere" in the covenant not to compete was meant by the parties to extend the ban to those clients outside of New England that the defendant actually solicited after obtaining permission to so.
Paragraph 8 of the broker's agreement bolsters the view that the ban on competition is limited to clients formerly served by the defendant. Paragraph 8 states that "[The covenant not to compete] shall not apply if ESI has not paid valid earned commissions pursuant to Section 4 or ESI CT Page 13458 has not provided Broker's clients a reasonable level of service. . ." This provision indicates that the ban on competition is tied to clients served by the defendant. The fact that the noncompetition covenant will not apply if commissions on prescriptions ordered by the defendant's clients are not paid or if a reasonable level of service is not provided to the defendant's clients supports the conclusion that the covenant only applies to those clients.
It is evident that the purpose of the noncompetition clause was to prevent the defendant, upon termination of her agreement with the plaintiff, from using the privileged information and favored relationship with her clients that she acquired during her term as a broker for the plaintiff to the disadvantage of the plaintiff. This purpose is fulfilled by applying the ban on competition to those clients formerly served by the defendant. It is about those clients that she has gained valuable information and it is with those clients that she has nurtured a familiar relationship.
Properly interpreted, the noncompetition covenant bars the defendant from marketing services or products to clients served by her as the plaintiffs broker. In so doing, the provision is not geographically over broad. As the defendant only served clients in New England, its geographic reach is limited to New England. An anti sales covenant which restricts sales to former customers of an employee and which is limited to the area in which the customers of the former employee are located is reasonable. New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 535
(1989).
The defendant also argues that the noncompetition clause provides an unreasonable degree of protection to the plaintiff. She contends that it is inappropriate to label third party administrators "clients" because third party administrators serve numerous pharmacy benefit management providers and do not have exclusive arrangements with the plaintiff to provide pharmacy benefit management products and services.
The fact that third party administrators have contracts with multiple pharmacy benefit management providers does not make it unreasonable to include third party administrators in the parties' proscription on competition. Third party administrators are critical players in the marketing of pharmacy benefit management services and products. Because third party administrators administer the pharmacy benefit management programs for numerous employers, it is more efficient to market services and products to them, rather than to employers individually. The defendant testified that she spent approximately 50 percent of her time marketing to third party administrators. The inclusion of third party CT Page 13459 administrators in the ban on competition was essential to protecting the plaintiffs interests.
The defendant further maintains that the expansive scope of the non-compete agreement prevents her from earning a livelihood in her chosen profession. Her claim lacks merit. The defendant is free to market pharmacy benefit management services and products in competition with the plaintiff to any third party administrator, employer or union in New England which was not a former client of hers. She is also able to solicit such entities which operate outside of New England. The noncompetition clause also allows the defendant to market to her former clients products and services in which the premium attributable to the pharmacy benefit management component is less than 20 percent. Finally, the defendant remains free to market fully insured plans to anyone. The defendant has not shown that the limitations imposed by the covenant not compete prevents her from earning a living as a broker of pharmacy benefit management services.
 III Violation of the Confidentiality Agreement
The plaintiff asserts that the defendant has disclosed confidential information in violation of the confidentiality provision of the broker's agreement and has exposed trade secrets in violation of the Uniform Trade Secrets Act, General Statutes § 35-50, et seq. The plaintiff seeks an injunction enjoining future violations. The defendant denies that she has violated her confidentiality obligations under the broker's agreement or violated the requirements of the Uniform Trade Secrets Act.
Paragraph 9 of the broker's agreement imposed upon the defendant the obligation not to disclose confidential and proprietary information of the plaintiff after termination of the agreement.[8] The defendant also has a statutory duty not to misappropriate the trade secrets of the plaintiff. General Statutes § 35-50, et seq. The plaintiff contends that a myriad of information, including its rate structure, underwriting models, pricing tactics, client lists, and computer software capabilities, was entitled to protection. The plaintiff however failed to establish that this information constituted confidential information or trade secrets under either the parties contract or the Uniform Trade Secrets Act.
To constitute confidential information or a trade secret, the information must contain a substantial element of secrecy. Town Country House Homes Service v. Evans, 150 Conn. 314, 319 (1963). CT Page 13460 The standard for determining whether information is secret is similar in many respects under both the common law and the statute. Both require that the information not be generally known or readily obtained by proper means and be subject to reasonable efforts to maintain its secrecy. SeeRobert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 538
(1988) and General Statutes § 35-51 (d).
No evidence was presented by the plaintiff to establish the extent to which the information was known outside the company, the extent to which the information could be obtained by proper means, or the efforts, if any, taken to maintain the secrecy of the information. On the basis of the record before me, the plaintiff has failed to establish a violation of the confidentiality provision of the parties' agreement or the Uniform Trade Secrets Act.
 IV Injunctive Relief
The plaintiff asks the court for an injunction enforcing the parties' covenant not to compete. The law governing the plaintiffs request is well known.
A party seeking injunctive relief has the burden of establishing irreparable harm and the lack of an adequate remedy at law. Walton v. NewHartford, 223 Conn. 155, 165 (1992). "Where an injury is of such a nature that it cannot be adequately compensated in damages, or cannot be measured by any pecuniary standard, it is irreparable. Whether damages are to be viewed by a court of equity as `irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." (Quotation marks and citations omitted.) New London v. Perkins, 87 Conn. 229, 235 (1913). In its consideration of a request for an injunction, the court may consider and balance the injury complained of with that which will result from interference by an injunction. Moore v. Ganim, 233 Conn. 557, 616 n. 25 (1995). The court must properly weigh the equities between the parties and only grant that relief compatible with the equities of the case.Walton v. New Hartford, supra, 223 Conn. 167.
The plaintiff has established that it will suffer irreparable harm for which it lacks an adequate remedy at law if the defendant is allowed to continue her efforts to market competitive products to her former clients in violation of the parties' non-compete agreement. Absent an injunction, the defendant will persist in her solicitation of the plaintiffs clients and the plaintiff will continue to be harmed through CT Page 13461 the loss of business. Injury of such a continuing nature is irreparable and warrants the intervention of an injunction to stanch the bleeding.Berlin v. Olsen, 183 Conn. 337, 342-43 (1981). See also Mattis v. Lally,138 Conn. 51, 56 (1951) in which the court found that irreparable harm would inevitably result from the violation of a covenant not to compete.
The appropriate length of an injunction is disputed by the parties. The plaintiff requests that the injunction extend for a period of two years from the date of the issuance of the injunction. The plaintiff contends that the defendant has purposefully delayed a hearing on its motion for a temporary injunction to prevent the plaintiff from obtaining the protections of the non-compete agreement. The defendant maintains that any injunction issued by the court may not extend beyond the contractual deadline of December 31, 2002, the two-year anniversary of the termination of the broker's agreement.
The issue of whether a court has the authority to issue an injunction enforcing a covenant not to compete beyond the time bar set forth in the covenant is an interesting and unsettled one. I could find no Connecticut case law directly on point and court decisions in other jurisdictions are decidedly mixed. See D. Aspelund C. Eriksen, Employee Noncompetition Law § 8.04 (2000). I need not reach the issue as the equities of the matter favor the issuance of an injunction which expires on December 31, 2002.
The parties entered into an agreement that prohibited the defendant from competing with the plaintiff for a period of two years after the termination of the agreement. The evidence established that the extent of the defendant's violation of the non-compete clause was limited. The defendant's marketing efforts were confined to two third party administrators over a two month period. Only seven employers of the thousands of groups[9] formerly served by the defendant terminated their pharmacy benefit management services with the plaintiff as a result of the defendant's violative conduct.
I do not find that the defendant intentionally delayed a hearing on the merits of the plaintiffs request for an injunction. The application for a temporary injunction was filed by the plaintiff on February 7, 2002. The parties attempted to negotiate a resolution. When those efforts were unfruitful, a hearing on the injunction request was held on August 7 8, 2002. On August 8, 2002, the parties agreed on the issuance of a court order prohibiting the defendant from contacting directly or indirectly any current client of the plaintiff pending further order of the court. CT Page 13462
The issuance of an injunction which terminates December 31, 2002 will provide the plaintiff with the essentials of the bargain that it reached with the defendant upon signing the non-compete agreement. It will also fulfill the purpose of that agreement because the defendant will have been put out of circulation with respect to her former clients for essentially two years and the plaintiff will have had that time to form alternative relationships with its clients.
Based on the foregoing, the defendant is hereby enjoined through December 31, 2002 from marketing competitive pharmacy benefit management products and services to her former clients, including third party administrators, employers and unions, in violation of paragraph 7 the broker's agreement dated March 1, 1990.
BY THE COURT
Judge Jon M. Alander