[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR MODIFICATION
The plaintiff has filed a motion to modify an existing CT Page 3469 support order entered on April 6, 1984, in Jerusalem, Israel.
Many of the facts that give rise to this matter are not in dispute. The plaintiff and defendant are American citizens who were married in New Jersey on May 25, 1968. It was the first marriage for each of them. Their son, David Harrison Kramer, was born on October 2, 1969. He is now 22 years old. Their second son, Jason Gabriel Kramer, was born August 14, 1972 and is now 19 years old. The plaintiff and defendant lived in New Jersey until August of 1979 when they went to live in Israel. Plaintiff and defendant lived and worked in Israel until May of 1984. During this time a child, Atara Sharon Kramer, was adopted. She is now 9 years old. On April 6, 1984, the plaintiff was awarded a final judgment of dissolution of marriage in the District Rabbinical Court, Jerusalem, Israel. A certified copy of said decree of dissolution of marriage has been filed in this court. Custody of David and Jason was awarded to the defendant with visitation to the plaintiff and custody of Atara was awarded to plaintiff with visitation to the defendant. The Israeli Rabbinical Court has the sole and exclusive jurisdiction in Israel to grant divorce decrees. All questions concerning the liquidation of their joint possessions, the custody of the children, the visitation rights and the child support of the daughter, are incorporated in an Agreement signed by the Kramers in Israel on April 6, 1984. Shortly after the divorce, plaintiff left Israel and took up residence in the State of Connecticut. Defendant followed in September of 1984.
The procedural background of this case leading to the motion to modify is as follows.
On April 15, 1991, a Complaint for non-support was filed by plaintiff in Magistrate's Court in New Milford.
On May 28, the parties appeared in Magistrate's Court, plaintiff represented by Attorney Betty G. Levy, Defendant appearing pro se. The case was continued upon the request of the Magistrate that both parties reappear with attorneys.
On July 23, 1991, the parties appeared with attorneys in Magistrate's Court. The Magistrate refused to invalidate the Israeli divorce, as requested by plaintiff, and requested that parties prepare briefs. CT Page 3470
On August 9, 1991, plaintiff's attorney requested in writing that the action go off without prejudice and that the case to transferred to Superior Court, New Haven.
On August 28, 1991, plaintiff's attorney filed an Application to File Out-Of-State Matrimonial Judgment in Superior Court, New Haven.
On September 16, 1991, defendant filed an Objection to the Application. The Court scheduled a hearing for October 16.
On September 20, 1991, plaintiff filed a Motion for Modification.
On October 16, 1991, the case was assigned to Judge Bassick, who sustained defendant's Objection to the Application to File.
On October 24, 1991, plaintiff's attorney filed a Complaint for Orders of the Minor Child and Motion for Child Support.
On November 11, 1991, defendant filed a Motion to Strike the Complaint. As plaintiff's attorney was out of the country, both the Complaint and Motion were requested to go off and were subsequently reclaimed.
On January 22, 1992, the case was transferred back to this court for hearing.
On February 10, the hearing was resumed.
The defendant in opposing the plaintiff's motion to increase the existing support order raises the following issues:
1. Whether this Court has the authority to modify a foreign divorce decree under the principle of comity.
2. Whether this Court should increase child support under CGS46b-61.
3. Whether this Court should increase child support under CGS46b-86.
4. Whether this Court should apply any change in child support retroactively.
These issues will be discussed seriatim.
I — THE ISSUE OF WHETHER THIS COURT HAS THE AUTHORITY TO MODIFY A FOREIGN DIVORCE SUPPORT DECREE UNDER THE PRINCIPLE OF COMITY CT Page 3471
The defendant argues that since the plaintiff attempted to file the Israeli judgment as a Connecticut judgment and his objection to that was sustained that in accordance with Litvaitis v. Litvaitis, 162 Conn. 54 (1972); Yoder v. Yoder, 31 Conn. Sup. 344
(1974); Baker v. Baker, 39 Conn. Sup. 66 (1970) and Hayes v. Beresford, 184 Conn. 558 (1981) the decree may not be modified. The court is not persuaded by that argument. In discussing the issue of comity regarding recognizing a Mexican decree, the court in Litvaitis supra at pp. 544-546 stated in part as follows:
 The full faith and credit clause of the constitution of the United States does not apply to a divorce obtained in a foreign country. Courts of the United States are not required by federal law to give full force and effect to a judgment granted in a foreign nation. . . . On the other hand, judgments of courts of foreign countries are recognized in the United States because of the comity due to the courts and judgments of one nation from another. Such recognition is granted to foreign judgments with due regard to international duty and convenience, on the one hand, and to rights of citizens of the United States and others under the protection of its laws, on the other hand. This principle is frequently applied in divorce cases; a decree of divorce granted in one country by a court having jurisdiction to do so will be given full force and effect in another country by comity, not only as a degree determining status, but also with respect to an award of alimony and child support. Regardless of its validity in the nation awarding it, the courts recognize a judgment of divorce rendered by the courts of a foreign nation as valid to terminate the existence of a marriage unless, by the standards of the jurisdiction in which recognition is sought, at least one of the spouses was a good faith domiciliary in the foreign nation at the time the decree was rendered. (emphasis provided)
In Hayes, the court stated at p. 562 in part as follows:
 The jurisdictional difficulty with the modification case derives from the fact that the complaint requests judicial action to modify a private agreement. It is Hornbook Law that the parties cannot confer subject matter jurisdiction on a court by consent, waiver, CT Page 3472 silence, or agreement. . . . This jurisdiction or difficulty is not cured by the incorporation of the separation agreement into the Mexican divorce decree. If the suit is on the agreement, the jurisdictional problem is not surmounted. If the suit is on the decree, as this suit was not, the moving party would first have to establish that decree in some fashion as a Connecticut judgment. See Krueger v. Krueger, 179 Conn. 488, 489, 427, A.2d 400 (1980); Litvaitis v. Litvaitis, 162 Conn. 540, 544, 295 A.2d 519 (1972). Furthermore, it would be essential to establish the extent to which the Mexican decree was modifiable under Mexican Law. (emphasis provided)
This court has found from the evidence presented that both the plaintiff and the defendant was a good faith domiciliary in Israel at the time their divorce decree was rendered. Therefore, this court has recognized that the decree because of comity. The requirement of Hayes that the moving party establish the foreign decree in some fashion has been met in this case by virtue of comity.
This court, therefore, has the authority to modify the Israeli decree under the principle of comity.
The present motion before this court is not to modify the agreement the parties entered into in Israel. Rather, it is to modify the decree that was entered. Furthermore, the parties have established by evidence and agreement the fact that the Israeli support decree is modifiable.
II — THE ISSUE OF WHETHER THIS COURT SHOULD MODIFY THE CHILD SUPPORT ORDERED ENTERED INTO IN ISRAEL UNDER THE PROVISIONS OF CGS46b-61.
The motion by the plaintiff to modify the existing Israeli support decree is not under the provisions of 46b-61. That section has to do with cases in which the parents of a minor child live separately and does not have to do with the modification of an existing decree. Therefore, this court is not considering any modification based on 46b-61.
III — THE ISSUE OF WHETHER THIS COURT SHOULD INCREASE CHILD SUPPORT UNDER CGS 46b-86.
The general rule regarding modifying a foreign matrimonial judgment as stated in Burton v. Burton, 189 Conn. 129, 134 is that when modifying a foreign matrimonial judgment, Connecticut courts CT Page 3473 must apply the substantive law of the foreign jurisdiction. The law of Israel regarding modifying an Israel decree as stated in Levi v. Tayeb, (1983) is as follows:
 (i) That an agreement, (incorporated in a Court decision) between two parents who got divorced, does not oblige the children because it is not certain that the interest of the child was the major preoccupation of the parents at the time they got divorced;
 (ii) However, even an agreement reached as a result of a minor's claim for child support, although it binds the minor and obliges him, it can be modified only if a substantial change of circumstances occurred;
 (iii) A change in the financial situation of one of the parents can be a relevant argument; and
 (iv) An increase in the needs of the child can be considered as a substantial change of circumstances which justifies the increase of the child support.
The court makes the following additional findings of fact. On the date of the Israeli decree, April 6, 1984, the defendant had a net income of approximately $6,500.00 annually and the plaintiff's net income was less than that. Both the parties were attempting to work out an agreement that they thought would be in the best interest of all three children. Although the defendant was given custody of the two boys, there was no obligation placed on the plaintiff to pay support to the defendant. The plaintiff's resent gross weekly income is $681.53 and her net weekly income is $514.82. The defendant's present gross weekly income is $1,294.00 and his net weekly income is $810.00. The court finds that there has been a substantial change in circumstances of both the plaintiff and the defendant, and a change in the financial situation of both parties.
The plaintiff also claims that the support order should be increased due to the need of the minor child for psychological counseling. The court finds from the evidence presented that the child does not need the psychological counseling and, therefore, will not consider an increase in support based on the claimed increase in the needs of the child for psychological counseling constituting a substantial change of circumstances. The plaintiff claims the right to have the existing Israeli support order increased not only on the grounds of substantial change of circumstances but also on the grounds of substantial deviation CT Page 3474 from the support guidelines.
It is, therefore, necessary to consider whether the court should increase the child support payments under 46b-86 that allows for a modification based on a substantial deviation from the support guidelines.
From all the evidence presented, the court finds that Israeli law does not allow for modification based on support guidelines as support guidelines do not exist under Israeli law. The support guidelines were recently discussed in Turner v. Turner, 219 Conn. 703
(1991). The specific issue involved in Turner was whether the support guidelines should be applied retrospectively to orders entered before the effective date of the support guidelines. In ruling that the support guidelines should be applied retrospectively based in part on statutory construction and in part on its federally mandated objectives, the Turner court stated in part at pp. 712, 713, 714, 715, 717 as follows:
 Section 1 of Public Acts 1990, No. 90-188, repealed General Statutes 46b-86 and substituted the following in lieu thereof: "(a) Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support or an order for alimony or support pendente lite may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either party OR UPON A SHOWING THAT THE FINAL ORDER FOR CHILD SUPPORT SUBSTANTIALLY DEVIATES FROM THE CHILD SUPPORT GUIDELINES ESTABLISHED PURSUANT TO SECTION 1 OF PUBLIC ACT 89-203, UNLESS THERE WAS A SPECIFIC FINDING ON THE RECORD THAT THE APPLICATION OF THE GUIDELINES WOULD BE INEQUITABLE OR INAPPROPRIATE . . . Other equally compelling principles of statutory construction, however, require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . Because a purely prospective application of the substantial deviation provision of P.A. 90-188 appears to be lacking in purpose, we look to the history of its enactment, to the mischief it was designed to remedy, and to the underlying policy it was intended to serve, to determine what purposes the legislature sought to achieve. Those purposes are best understood in the context of developments in the federal law regarding child CT Page 3475 support in the 1980s and in the context of other developments in the child support law of Connecticut.
 Since 1984, the United States Congress has actively encouraged states to take measures to assure that children receive adequate financial support from their parents, thereby reducing governmental expenditures for support of children. The Child Support Enforcement Amendments of 1984, enacted as Public Law 98-378
and codified at 42 U.S.C. § 666 et seq., amended part D of title IV of the Social Security Act to require that states establish procedures to improve the effectiveness of child support enforcement (IV-D) programs. In those amendments, Congress conditioned the states' receipt of federal funds for AFDC programs and for IV-D programs upon compliance with these requirements. Among the requirements was a provision directing states to establish, by law or by judicial or administrative action, guidelines for child support award amounts that would be available to, but not binding upon, judges who had the authority to enter child support orders. 42 U.S.C. § 667 (a). Such guidelines were intended to provide reliable benchmarks for use in quasi-judicial proceedings, to expedite awards of child support, and to guide courts to more equitable awards in order to address the "feminization of poverty" resulting from consistent underestimates of the cost of rearing children by increasing the average level of awards. See, e.g., R.D. Thompson S.F. Paikin, "Formulas and Guidelines for Support," 36 Juv. Fam. Ct. J, 33 (1985)
 Four years later, Congress enacted the Family Support Act of 1988 to increase the responsibility of the states to assist all families, including those who do not receive welfare assistance, to establish, modify and enforce support obligations. Public Law 100-485, codified at 42 U.S.C. § 66 et seq. Section 103(a) of the 1988 act required the states to create a rebuttable presumption that the amounts recommended in the child support guidelines are the correct amounts to be awarded. Section 103(c) of the act further required that the CT Page 3476 states establish a procedure for "the periodic review and adjustment of child support orders being enforced under this part." (Emphasis added.)
 As the state and the plaintiff argue, the natural and plain meaning of the reference in 103(c) of the Family Support Act to "orders being enforced" encompasses all support orders currently under the jurisdiction of the courts of the state. Periodic reviews and adjustments of support orders were intended to create a mechanism by which orders entered before the promulgation of a state's child support guidelines could be brought up to levels comparable to those entered after the guidelines took effect. Without such a mechanism, full implementation of the goals served by promulgating guidelines would be delayed for many years. The grandfathering of pre-guidelines guidelines orders would frustrate the congressional intent to have parents, rather than state and federal governments, assume the financial responsibility for support of their children to the best of their ability.
 In light of the federally mandated objectives of P.A. 90-188, it language and legislative history, and contemporaneous statutory developments in Connecticut's child support law, we conclude that the magistrate improperly refused to consider modifying the child support order in this case on the basis of a claimed substantial deviation from the child support guidelines. (emphasis provided)
This court also has reviewed the State Plan Approval and Grant Procedures regarding the administration of Title IV-D of the Social Security Act as found in 45 C.F.R. Chapter 111, 301.01, 302.36, 305.25, 305.32.
301.0 Scope and applicability of this part
This part deals with the administration of title IV-D of the Social Security Act by the Federal Government including actions on the State plan and amendments thereto and review of such action, grants under the approved plan; review and audit of State and local expenditures; and reconsideration of disallowances of expenditures for Federal financial participation. CT Page 3477
302.36 Provision of services in interstate IV-D cases
(a) The State plan shall provide that the State will extend the full range of services available under its IV-D plan to any other State in accordance with the requirements set forth in 302.7 of this chapter for:
(3) Establishing a child support obligation
305.25 Support obligations
For the purposes of this part, in order to be found to be in compliance with the State plan requirement to establish support obligations (45 C.F.R. § 302.50 and 302.53), a State must:
(a) Have established and be utilizing written procedures for the establishment of a child support obligation for any child.
(2) Who has not previously had a child support obligation established by court order or by other legal process established under State law.
305.32 Provision of services in interstate IV-D cases
For purposes of this part, to be found in compliance with the State plan requirement for provision of services in interstate IV-D cases (45 C.F.R. § 302.36, a State must:
(d) Have established and be utilizing written procedures for establishing support orders upon request by another State, including procedures for responding to a complaint under the Uniform Reciprocal Enforcement of Support ACT (URESA).
The issue before the court is whether the general rule regarding modifying a foreign matrimonial judgment that requires Connecticut courts to apply the substantive law of the foreign jurisdiction prohibits this court from applying the support guidelines. This appears to be a first impression issue in Connecticut. In Adamsen v. Adamsen, 151 Conn. 172, 176 (1963), the court was faced with the effect to be given to a custody order entered in Norway. In discussing the rights of the parties under that decree, the Adamsen court states in part as follows:
 It is a well-settled principle that, unless the law of another jurisdiction or rights arising thereunder contravene our public policy or violate our positive laws, a plaintiff may enforce in this state any legal right of action which he may have whether it arises under our own law or that of another jurisdiction. (emphasis provided)
CT Page 3478
In Walzer v. Walzer, 173 Conn. 62, 69-70, (1977), the issue before the court had to do with the enforcement of a New York alimony and support order. The Walzer court stated in part as follows:
 As our society has become increasingly mobile and as familial disintegration has increased, the problem of obtaining interstate enforcement of domestic relations orders has become acute and has led to a trend toward greater cooperation among states. This trend has been recognized in Connecticut and adopted as the policy of this state by the legislature, which has enacted General Statutes 17-327 through General Statutes 17-355b, popularly known as the Uniform Reciprocal Enforcement of Support Act. It must be remembered that comity is a flexible doctrine, the application of which rests in the discretion of the state where enforcement of a foreign order is sought. Because comity is a flexible doctrine, its contents are peculiarly subject to the dictates of public policy and considerations of fairness to litigants.
The Walzer court held that the adoption in Connecticut of the Uniform Reciprocal Enforcement of Support Act resulted in an adoption of policy of this state to attain interstate enforcement of domestic relations orders. At the present time by virtue of federal statutes, all states are required to establish support guidelines in order to receive federal funds for AFDC programs and for IV-D programs. States are further required to create a rebuttable presumption that the amounts recommended in the child support guidelines are the correct amounts to be awarded. Connecticut has adopted such child support guidelines. The purpose of the federal legislation for support guidelines is "to actively encourage states to take measures to assure that children receive adequate support from their parents." The congressional intent is to have parents, rather than state and federal governments, assume the financial responsibility for support of their children to the best of their ability. Section 14b-86, as amended by 1 of Public Acts 1990, No. 90-188 provides that any final order for support may be modified upon a showing that the final order for child support substantially deviates from the child support guidelines. The implementing federal regulations for State Plan Approval and Grant Procedures, 305.25 mandates each state to have a written procedure for establishment of a child support obligation for any child who has not previously had a child support obligation established by court order or by other CT Page 3479 legal process established under State law. Support guidelines have now become a matter of public policy both on a national level and on a state level including the State of Connecticut. The purposes of the support guidelines would not be accomplished by failing to apply such guidelines to support decrees rendered in a foreign country. Since comity is a flexible doctrine and its contents are subject to the dictates of public policy and considerations of fairness to litigants, this court holds that it is appropriate to apply support guidelines in determining the issue of modification of a support order that had been entered in a foreign country that does not have support guidelines.
The parties are also in disagreement as to how the support guidelines should be applied if, in fact, they are to be applied.
The court makes the additional findings of fact. At the time of the parties divorce in Israel, the parties submitted to the court an agreement between them dated April 6, 1984. The relevant portion of the translation of that agreement from Hebrew into English is as follows:
 10. Alan will pay maintenance support for the upkeep and education of Atara, as of September 1, 1984, in the sum of at least 300 U.S. dollars per month (or an equivalent sum in Shekels if the parties continue to live in Israel) until Atara reaches adulthood. The sum will be paid to Chava once a month no later than the fifth of each month.
 11. In accordance with the changes in Alan's financial situation, these payments will change as follows:
 (A) Alan will pay for Atara 15% of his "net" salary, i.e. his "gross" salary minus all income taxes and other permanent taxes, all medical insurance (Kupat Cholim) that will be paid for David and Yossi and all tuition payments that will be paid for David and Yossi.
 (B) In any event, these payments will not be less than the payments mentioned in the aforesaid Paragraph 10.
The parties were aware at the time of their divorce that they would be moving to the United States and they, therefore, also reduced their agreement into the English language which agreement was signed by them. The relevant portions of that agreement are as follows: CT Page 3480
 10. Alan agrees to pay Hava as participation in the maintenance costs of Atara the sum of at least 300 U.S. dollars (or the equivalent thereof in Shekels should the parties continue to reside in Israel) per month, from 1 September 1984 until Atara reaches the age of maturity. This sum shall be paid to Hava once a month, no later than the 5th day of each month.
 11. In accordance with changes in Alan's financial situation, these payments shall be adjusted as follows:
 a. Alan will pay for Atara 15% of his net monthly salary, to be defined as follows: his gross salary, less all taxes, all medical payments for David and Jason, and all education costs for David and Jason.
 b. In no event will Alan's payments be reduced below the levels specified in section 10 above.
In discussing the interpretation of agreements between parties that are incorporated into dissolution decrees, the court in Barnard v. Barnard, 214 Conn. 99, 109-110, stated in part as follows:
 "A contract is to be construed as a whole and all relevant provisions will be considered together." In giving meaning to the terms of a contract, we have said that "`a contract must be construed to effectuate the intent of the contracting parties."' In ascertaining intent, "we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." "`The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used."' (emphasis provided)
In considering the fact that the parties intended to leave Israel and return to the United States shortly after they obtained their divorce in Israel, this court finds that the intention of CT Page 3481 the plaintiff and the defendant under the stipulation they entered into can best be determined by reference to the stipulations that they signed in English. The dispute between the parties is whether by virtue of the stipulation that they signed the defendant is obligated to pay college costs for David and Jason. The defendant has already paid for the college course for David and Jason is still attending college. This court finds from all of the circumstances surrounding the making of the stipulation and the motive of the parties that the reference in the English translation to "all education costs for David and Jason" was intended to require the defendant to be responsible for all of the college education costs of both of those children. In applying the support guidelines to this case, the court has considered the financial affidavits submitted by each of the parties. The plaintiff has a gross weekly wage from her principal employment of $681.63 and a net weekly wage of $514.82. She recently moved from the home that she still owns and now resides with her minor child in residence owned by a male companion. Her financial affidavit shows rental income from the home she still owns of $184.62 per week and expenses for that property totalling $271.10 per week or net weekly loss of $86.48. Those figures do not take into consideration depreciation that she would be able to take on the rental property. This court in applying the support guidelines has not taken into consideration that rental loss and if the support guidelines do not call for such investment losses to be considered. The defendant has also submitted a financial affidavit that shows a gross weekly income of $1,294.00 and a net weekly income of $810.00. He also shows a weekly loss of $61.00 from an outside business that he is engaged in. This court has similarly disregarded that $61.00 loss as the guidelines do not call for such losses to be considered. The combined net weekly income of the parties is $1,324.82. That does not take into consideration the defendant's weekly expense for Jason's education of $186.00 per week. From the evidence presented, this court finds that the proper amount to allocate for educational costs for Jason is $175.00 per week and that in determining the appropriate amount under support guidelines that the $175.00 per week should be deducted from the defendant's net weekly income of $810.00 leaving a net weekly amount of $635.00 for the defendant. The plaintiff's financial affidavit shows child care costs of $77.43 weekly. However, the plaintiff testified that that sum was an error and the correct weekly child care cost is presently $105.25. The weekly cost of unreimbursed child day care where the care-providing parent is employed is a special exemption that should be deduced in determining income under the child support guidelines. Therefore, in order to arrive at the plaintiff's correct net income the $105.25 is deducted from her weekly net income of $514.82 to arrive at a net income of the plaintiff for child support guideline purposes are $409.57. The combined net weekly income of the plaintiff ($409.57) and the defendant ($635.00) for CT Page 3482 the purpose of calculating the recommended amount under the support guidelines is therefore, $1,044.57. The support guidelines recommend a total support order of $251.00 weekly for which the defendant's share would be $153.00. This court is, therefore, granting the plaintiff's motion to modify the existing support order and in accordance with the support guidelines is increasing that order to $153.00 weekly.
IV — THE ISSUE OF WHETHER THIS COURT SHOULD APPLY AND MODIFICATION OF SUPPORT RETROACTIVELY??
In discussing the issue of retroactive modification of support orders, the court in Turner at pp. 715-716 stated in part as follows:
 The legislative history of the enactment of P.A. 90-188 indicates that several legislators expressed concern about the possibility that modification of support orders might retroactively create automatic arrearages. See, e.g., 33 S. Proc., 1990 Sess., p. 2705, remarks of Senator Thomas F. Upson. To address this concern, 1 of P.A. 90-188 states that "[n]o order for periodic payment of permanent alimony or support may be subject to retroactive modification, except that the court may order modification with respect to any period during which there is a pending motion for modification of an alimony or support order from the date of service of notice of such pending motion upon the opposing party pursuant to section 52-50." We construe this language as making a distinction between, on the one hand, an impermissible retroactive modification that would create an arrearage dating back to the time at which the trial court determined that a substantial deviation had occurred, and, on the other hand, a permissible retrospective application of the statute that would authorize the court to modify, for the future, orders entered prior to the act's effective date to bring them up to the level established by the present guidelines. By limiting retroactivity to the period during which a motion for modification was pending, the legislature preserved the due process rights of individual obligors to notice of their potential liability and an opportunity to rebut the presumptions created by the operation of the guidelines. The legislative record manifests no intention, CT Page 3483 however, to limit the application to the act only to orders entered after its effective date, in contravention of the federal mandate that all "orders being enforced" be subject to periodic review and adjustment.
The right to enter a retroactive modification with respect to the period during which there is pending a motion for modification rests with the discretion of the court. In this case, this court is ordering that the modification of support order be retroactive to January 22, 1992, the date the hearing commenced before this court.
Finally, the parties are in dispute regarding the issue of payment of counsel fees for Attorney Levy. The court finds the additional facts regarding this issue. Attorney Levy agreed to accept this case as a referral on the basis that she would not charge any legal fees to the plaintiff and would accept as legal fees any amount, if any, that were awarded by the court. Attorney Levy is in private practice. This court finds that an acceptance of a case on this basis does not preclude an award of attorney's fees. No evidence was presented to the court as to whether attorney's fees are allowed to be awarded under Israeli law as an incident to the modification of a support decree. As stated in Adamsen, supra, "where the record contains no showing as to what the law of (the foreign jurisdiction) is with respect to (attorney's fees) the trial court is entitled to assume that the law of the foreign country is the same as that in Connecticut."
The claim for attorney fees as filed by the plaintiff consists of five separate parts:
1. A fee for $826.00 paid to obtain an authentication of the divorce judgment,
2. A claim for $1,087.50 paid to obtain legal advice as to Israeli law,
3. A claim for $280.00 paid to obtain an official translation of the divorce judgment and separation agreement,
4. A claim for $235.11 for legal correspondence costs, and
5. A claim for legal fees and costs for attorney Levy in the amount of $6,206.20.
This court has carefully considered all of the statutory criteria in determining the issue of an award of attorney fees. The request for attorney's fee is denied except for that portion of the attorney fees related to legal services provided by CT Page 3484 Attorney Levy. The defendant is ordered to pay the sum of $4,000.00 for counsel fees incurred by the plaintiff for services rendered by Attorney Levy.
The following orders are, therefore, entered:
ORDER
1. Support is increased to $153.00 per week retroactive to January 22, 1992. The arrearage resulting from the retroactive support order is to be paid at the rate of $47.00 per week. That results in a combined support order plus arrearage order of $200.00 per week.
2. The $4,000.00 allowance for attorney fees is to be paid by December 31, 1992.
Sidney Axelrod, Judge