[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant matter is presented to the court as a consolidation of two actions arising out of the construction of a custom built single family residence by Randy Noe (hereafter "Noe") for Howard and Karen Glaser (hereafter the "Glasers") on their property located at 26 Lake Road, in Newtown, Connecticut. In his case in chief, Noe alleges that he performed work pursuant to a construction contract with the Glasers and claims a balance due of $34,366.48, together with interest and attorney's fees. He originally brought this action to foreclose a mechanic's lien that he caused to be filed against the Glasers' Lake Road property. The Glasers, upon motion heard and granted on June 30, 1987, substituted a bond for the lien, the latter then being released by Noe.
On June 2, 1987, Noe commenced suit against the Glasers. On December 15, 1987, he amended his complaint. It is upon this amended complaint that his case was tried.
In response to that amended complaint, the Glasers filed a six count counterclaim dated May 11, 1989. Earlier, on August 18, 1987, they had instituted suit against him claiming damages, interest, counsel fees and costs, to which he filed a two count counterclaim. Their complaint, in final form, is the mirror image of their six count counterclaim of CT Page 3854 May 11, 1989, in which they allege, as Noe's misfeasance, the following: breach of contract in failure to complete certain items, improper completion of items, breach of warranty, improper charges for extra items, delay, failure to waive priority of lien, and in the sixth count, negligence.
After hearing, the court finds the following. On June 21, 1985, the Glasers purchased an undeveloped lot at 26 Lake Road, Newtown, Connecticut, for the purpose of building a home. They retained Wade Roese to design the house and the engineering and surveying firm of Carroccio-Covill was hired to perform deep hole tests, survey the property, prepare a plot plan and a topographical map. During the month of October 1985, Carroccio-Covill staked the house and driveway locations on the property. The Glasers then had areas of the property cleared in preparation for construction. At this time, the Glasers were also obtaining bids from contractors for construction of the house.
Noe, who had prior experience as a general contractor and had previously constructed several houses similar to that designed for the Glasers, was asked to submit a bid on the project.
On November 11, 1985, he presented the Glasers with an estimate of construction costs which were thereafter revised on January 18, 1986, and revised again on March 2, 1986.
During the month of December 1986, although no written contract had been executed by the parties, Noe, as general contractor, began site preparation and foundation construction pursuant to his verbal agreement with the Glasers.
During the next month, concrete footings were poured, and sometime between then and March 1986, the foundation walls were poured.
Although work ceased mid-February 1986, it was thereafter resumed when the parties, on March 23, 1986, signed a written contract. That contract (Plaintiff's Exhibit A) provides, inter alia, that Noe is responsible for labor, supervision and materials with the following major exceptions: (1) light fixtures, (2) painting, (3) locksets, (4) kitchen and bathroom cabinets and vanities, (5) carpeting, and (6) kitchen appliances. The contract also sets forth a fixed price, with allowances for some items and credits for other work, and has an agreed construction completion date of October 1, 1986. The contract also provides that alterations, additions and deviations from the CT Page 3855 plans and specifications for the project, and extra charges for such changes must be agreed to in writing. All additional charges included in such writings were to be paid upon completion of the alteration, addition or deviation.
Further, the contract sets out the total price of the project as follows: base price of $233,705.00 minus credits of $16,550.00 given for the elimination of certain work or the substitution of less expensive materials for the more costly, together with allowances of $92,030.00. These allowances, subject to increase or decrease, were estimates of the cost of certain work and materials and if increased during the course of construction, were treated as extras and added to the base price while decreases were treated as credits in reduction of same. The Glasers were authorized under the agreement to require itemized invoices and/or cancelled checks to substantiate charges included in the allowances.
In addition to the down payment of $35,000.00 paid by the Glasers to Noe, the balance of the contract price was to be paid in installments as various stages of construction were completed and construction mortgage advances were made to the Glasers by their lender. Such monetary advances were to be made in accordance with the lender's schedule.
As progress was made on the construction of the house, its systems and appurtenances, various inspections were made and approvals obtained from the Newtown Building Department. These inspections resulted in approval of the rough plumbing, electrical and framing on September 2, 1986. A final inspection was made on December 31, 1986. That inspection identified the following problems: electrical box in garage needed to be covered, a handrail was missing, a plug in the kitchen was missing, the deck girder needed plates, and the wall ties in the basement needed to be snapped off. (Defendant's Exhibit No. 92.) Further, at the time of this inspection, several of the electrical fixtures that Mrs. Glaser had ordered had not arrived at the job or had arrived broken and had to be sent back. In order to obtain the Certificate of Occupancy, temporary ceramic fixtures were installed with the intention that when the permanent fixtures arrived, Noe, through his subcontractor Raymond Simpson, proprietor of S S Electric, would install them.
When the problems identified by the final inspection were resolved, the final inspection was resumed and the structure and its systems were found to be in substantial compliance with the building and zoning codes. Consequently, on January 13, 1987, a Certificate of Occupancy was issued. CT Page 3856
On January 23, 1987, the Glasers moved into their new home and, at the same time, directed Noe to relinquish all keys to same. They instructed that henceforth access to the interior of the house would have to be arranged through them.
On February 19, 1987, Noe's electrical subcontractor worked at the house for part of the day. This was the last day that work was performed by Noe, his employees or subcontractors on the Glasers' residence.
Earlier, the Glasers had evidenced their concern to Noe regarding the electrician's $7,300.00 in extra charges. Nevertheless, on January 7, 1987, the Glasers paid Noe $20,000.00 on account and on January 26, three days after moving into their new home, paid him an additional $10,000.00 for a total of credits and payments made of $333,574.40.
Thereafter, the parties scheduled a meeting for January 28, 1987, to include the electrician, for a discussion of his extras. That meeting was cancelled because the Glasers needed more time to review the bills in detail. A similar meeting was scheduled, but this time Simpson had to leave for another appointment after having waited one and one-half hours for the Glasers to finish meeting with other subcontractors. Consequently, a discussion of the charges with Simpson and Noe did not take place. A final meeting was scheduled for March 13, but was cancelled by Karen Glaser who took the position that there was no reason to meet until the work was completed. Although Noe claims that a balance of $34,366.48 was due him as of February 20, 1987, on March 13th he demanded partial payment of $20,000.00. The $34,366.48 that Noe claims is still due and owed to him allegedly represents the base contract price, together with allowances and extra charges, less credits and payments made by the Glasers.
In his brief, Noe claims:
 "The cancellation of the March 13 meeting, the refusal of the defendants to discuss extra charges, the denial of access to complete the few minor items which needed to be completed, therefore resulted in a complete and total breach of the contract by the defendants. It should be noted that paragraph 14 of the contract prevents the Owner from interfering with the Contractor while the building is in progress and paragraph 2 requires the Owner to make CT Page 3857 payments as construction advances. It is these parts of the contract which the defendants breached."
He contends that, pursuant to a written contract with the Glasers, he constructed their dwelling at a cost of $367,940.88; that the Glasers paid $333,574.40 on account; and that even after demand they refuse to pay the balance of $34,366.48.
While the Glasers do not dispute refusing to pay anything further to Noe until he satisfied his obligation under the contract, it is clear from the credible evidence adduced at trial that they did not breach the written agreement and that their position is defensible under same.
Noe has failed to provide the court with credible proof that the Glasers prevented him or his subcontractors from entering the dwelling to work on same until it became clear that he would not perform any further work on the premises without first receiving a payment. Further, it was not unreasonable or in violation of the contract for the Glasers to change the alarm codes and ask for the return of all keys in order to protect themselves and their personal property once they took possession of the premises and physically moved into same. Rather than prevent or unreasonably impede access to their home, they stood ready to provide reasonable access to Noe and his subcontractors so that work could continue.
Further, Noe introduced no persuasive evidence that an installment payment, or payment on account, or final payment was due him when he made demand for same on or about March 13, 1987. As indicated, the payment of installments under the contract was dictated by the lender's schedule. Additionally, the contract provision regarding extras and their payment was modified by the parties' practice to the point where it is of little or no authority and, in any event, did not require that the payment demanded be made.
Finally, cancellation of the March 13th meeting and the Glasers' announced position came as a consequence of their frustration with improperly installed or defective work and Noe's failure to complete the construction in a timely manner.
Further, they were exasperated because Noe had failed to provide the construction supervision they had required and reasonably expected of a general contractor. By his own admission, he failed to supervise or provide a supervisor for CT Page 3858 the work of his subcontractors on a number of occasions. He also caused the Glasers considerable concern over his failure, on several occasions, to communicate to his subcontractors the various items in need of repair or replacement listed on the Glasers' check or punch-list, so called. He also added to their frustration and assisted in crystalizing their position by failing to provide them, in a timely manner, with the itemized billing they had requested for months. After two meetings with Noe in February 1987, at which meetings his unfinished work was discussed, the Glasers decided they need accept no further excuses nor have any further meetings with him until he completed the job and repaired his defective work. Further, in response to his March 13th demand for payment, they took the same position. Shortly thereafter, Noe filed a mechanic's lien against their property.
The Glasers never said that they would not pay for the authorized extras or make the final installment when properly due under the terms of the contract; rather, in response to Noe's demand, they stated that they would not make a further payment until his obligation and duty under the contract was satisfied and completed.
It is clear to the court that the plaintiff, Randy Noe, has failed to prove by a fair preponderance of the evidence that the Glasers breached their contract with him. It is just as clear, however, that Noe did breach that agreement when he abandoned his contractual obligations without justification or cause and he is, therefore, to be held accountable for same.
In response, Noe claims that he was not provided with not ice regarding certain items for which damages are claimed. However, the Glasers contend that a number of these defects were not discovered until after he walked off the job. Since the purpose of notice is to afford the contractor an opportunity to repair, it would have been pointless to notify him of warranty repairs after he filed his mechanic's lien.
As indicated above, the Glasers' counterclaim filed in response to Noe's complaint, is the mirror image of the complaint in their August 18, 1987 action against him; consequently, the various claims need only be discussed once.
The Glasers' claim that there were defects in materials or workmanship in the following areas: master bedroom, bathroom, guest bedroom and bathroom, entry foyer, kitchen and dinette, computer room, basement, porch doorway, exterior siding, railings, roof, placement and grade of CT Page 3859 driveway, and siting of the house. The report of their expert witness, Carl Rodriguez, used to buttress their position and provide an effective pricing guide for setting the cost of repairing or replacing defective work and materials, considered each area of their concern. (Defendants' Exhibit 12.)
The first item is the master bedroom suite, bedroom and walk-in closet: "Remove bifold door to walk-in closet and replace with pocket door as per basic contract to include frame, trim and hardware. See Schedule A, item #M. See photo #1. $315.00." Also associated with this are the next five items which Rodriguez testified were necessary to make the change in the door.
After reviewing the testimony and exhibits pertaining to these items, the court finds that the change from a pocket to a bifold door was both necessary and approved by the Glasers and that it was completed in accordance with the contract.
The next items in Rodriguez' report are: "Remove and reset two eyeball ceiling fixtures. Improperly located. See photo #2. $120.00," and "Repair sheetrock ceiling a/c fixtures. $80.00." After review, the court finds that the fixtures were located as directed, either by Karen Glaser in a "walk through" or in the Glasers' electrical plan that she prepared, and therefore the charges are not justified.
The final items "Clean allowance, Paint allowance, and Varnish one door" are, by Rodriguez' testimony, associated with either or both of the other items (i.e. the pocket door and the eyeball fixtures) and are therefore also unjustified. Additionally, it is noted that no painting was included in the original contract.
The next room on his report is the bathroom in the master bedroom suite. The first item is: "Remove bifold door to toilet room and replace with pocket door as per basic contract to include frame, trim and hardware. See schedule A, item #N. See photo #3." Rodriguez also testified that the next six items were associated with this change as was the item, "Remove and reset one electric wall switch for toilet room," part of the "Clean allowance", and all of the "Paint allowance" and the item "Varnish door." While it is undisputed that this door was supposed to have been a pocket door, the court finds that such could not have been installed without ultimately occasioning damage to ceramic tiles on an adjacent wall, and further finds that Karen Glaser agreed to change the door to a bifold. CT Page 3860
The next two items, "Repair ceramic tile access panel for Jacuzzi motor. $40.00," and "Repair ceramic tile at shower threshold. See photo #4. $150.00," are not disputed by Noe.
The final item is, "Remove, recondition and reset shower door. $90.00." After review, the court finds that Noe is also responsible for the required repair.
The next room considered in the Rodriguez report is the hall bathroom: "Remove non-matching ceramic tile and replace with like tile. (Customize tile) See photo #5. $110.00." Noe testified that he counted the number of checkered tile necessary in this bathroom, based on his measurements of the room and the tile plan Mrs. Glaser prepared (Exhibit T-1 through T-5). Noe also testified that in the original plan, only one medicine cabinet was indicated, and that the defendants changed this to two medicine cabinets, shown in Exhibit GGG, after ordering tile. The tile plan for this room Exhibit T-3, and Exhibit 52 clearly show this. The tile setter also testified that Noe counted this tile using the plan Exhibit T-3 and gave the number to the defendants. The court accepts Noe's testimony as credible and convincing, and therefore finds that he is not responsible for this item.
Next, Rodriguez considered the guest bedroom and bathroom. "Remove bifold door to bathroom and replace with pocket door as per basic contract to include frame, trim and hardward. See Schedule A, item #10. See photo #6." The balance of the items in this area, as set out in his report, would result from changing back to a pocket door. However, none of the above are Noe's responsibility. Clearly, the proposed location of the pocket door required the change to a bifold, which the court finds was also approved by the Glasers.
The next area on Rodriguez' report is the entry foyer. Several items are examined. The first is: "Coat closet bifold door hardware. Installed incorrectly, doors damaged in process. Must be replaced including hardware." With regard to this claim, the Glasers have failed to prove, by a fair preponderance of the evidence, that Noe incorrectly installed the hardware or is responsible as claimed. Rather, it appears that the hardware, which was purchased by the Glasers and installed by Noe, was defective and the conditions complained of are the responsibility of the manufacturer. CT Page 3861
The remaining items, namely, "Repair cedar board ceiling, on account of fixture cutouts too large. $260.00, Remove and reset one electric fixture. $50.00, Stain cedar boards to match. $100.00, and Clean allowance. $30.00," are the responsibility of Noe.
Similarly, he is responsible for the following in the kitchen and dinette, all as set out in the Rodriguez report. "Repair cedar board ceiling a/c fixture cutouts too large. $420.00, Remove and reset two electric fixtures. $100.00, Stain cedar boards to match. $100.00, Clean allowance. $30.00." All of the above result from the failure of Noe and his electrical subcontractor to obtain sufficient information regarding the type of fixtures that the Glasers intended on using in their new home. Once they were provided a list of the fixtures, without specification, further inquiry should have been made. As a result of their failure to so do, ceiling cutouts were made too large for the fixtures. Noe and Simpson, the electrical subcontractor, are the experts and for them to expect the Glasers to be able to tell them whether the imported fixtures would fit standard American electrical boxes is unreasonable.
The next room reviewed in the report is the dining room. The only item of concern to the Glasers is "Hang three electric fixtures that were not hung. 150.00."
The electrical work was an allowance under the contract and the Glasers were not charged for hanging these fixtures; therefore, Noe is not responsible for same, nor is he responsible for the unfinished fireplace in the "Great Room" as it is clear that an allowance was made for same in the specifications and the Glasers were not charged for "Install Andes black granite at fireplace facing and hearth." The claim made for restaining the single door from the "Great Room" to the deck is ineffective. The court finds that Noe had no responsibility to stain this door in the first instance and has none now.
However, the court does find Noe responsible for the following in the loft area: "Remove and replace one door for access storage and including hardware. (Improperly cut) $85.00" and "Paint to match. $50.00."
The next area considered in the report is the computer room. The following concerns are indicated: "Remove and relocate one electric fixture hanging too close to cabinet, Repair sheetrock ceiling, Clean allowance, Paint allowance." The court is persuaded that this fixture is located where Karen Glaser directed, either in her plan or her "walk CT Page 3862 through," and therefore Noe is not responsible for relocating same or the other work related thereto.
The next area addressed is the basement. The first item is "Surface patch concrete floor, $116.00." The court finds this to be Noe's responsibility. The second is "Remove 2" x 4" partition framing along with sheetrock and wood door for wine storage room and replace with a 4" block wall and steel door as per basic contract. See specifications sheet page #2, paragraph D, item #11. See photo #7." As indicated in Noe's brief, the parties agree that the specifications require this wall to be constructed of concrete block. However, Noe testified that when it came time to construct the wine cellar, he suggested to the defendant, Howard Glaser, that the one wall which needed to be built (the other three were foundation walls) be wood frame as it would be cheaper. Further, since utility panels were supposed to be located in that room, it would be easier to locate them on wood frame walls then on a block wall. The court considers this testimony credible and finds that Howard Glaser did agree to such change and that, therefore, Noe is not responsible for removing or replacing the wall.
Although the specifications (page 3, paragraph D, item #11) require the construction of a workbench in the basement, no dimension or details of construction are provided and therefore no dollar value can be assessed.
Next, Rodriguez considers miscellaneous interior items, the first being, "Repair horizontal hardware at various locations. $240.00." The court finds this to be Noe's responsibility as is the second item, "Refit one storm door to porch. $65.00."
After reviewing interior concerns, the report considers the "Exterior." Several items are noted including "Furnish and install stonework for chimney at rear elevation — $8,475.00. This work was neither completed nor was an allowance given; therefore, Noe is responsible. The Glasers have had the chimney constructed at a cost exceeding the estimate. The actual costs are $8,500.00 for labor and $2,483.35 for materials for a total of $10,983.35. Although higher than Rodriquez' estimate, the appear to be reasonable.
With regard to the balance of the items reviewed by Rodriguez in this area, it is clear that Noe is responsible for the following: the cost of repairing and replacing warped and misaligned decking damaged in part by a leaking gutter and standing rain water. CT Page 3863
The Glasers, for the reasonable price of $1,100.00, contracted with Bob Burke Contracting to provide the materials to renail the 2" x 6" pressure treated decking where possible and replace where necessary; to sand deck rails and seats where cedar and redwood had split; to install 6 joint cedar siding along the side of the brick chimney where siding had not been completed; to replace treads on spiral staircase where pressure treated wood had warped or rotted; and to remove the replaced materials and debris from the site. (Defendants' Exhibit 20.)
Noe, however, has not been proved to be responsible for the cost of sanding the deck to remove tar stains from it. This problem appears to have been caused by vandalism, and a damage claim submitted by the Glasers to their insurance carrier for same was honored. While Noe did offer to sand the deck for an additional fee, no agreement was reached, no work was done and no charge ever made.
The Glasers obtained a reasonable proposal from Peter H. Nowak for the removal and replacement of chimney caps with custom made copper coated caps. The caps in need of replacement were of inferior material and not in compliance with specifications and, as a result, they rusted through in places and stained the surrounding area. The cost of such repair is as follows: materials $600.00, and labor $336.00 for a total of $936.00. (Defendants' Exhibit 21.) Noe is responsible for this sum.
The next area of concern in Rodriguez' report is the roof, and the first claimed repair is "cut out and repair asphalt shingle roofing and sheathing at rear center bedroom roof a/c humps. See photo #12 $433.00."
There is no doubt that this is Noe's responsibility as is the $25.00 cost of replacing the marble chips that were discolored as a result of the use of improper materials in construction.
He must also bear the $150.00 cost for replacing damaged asphalt shingles at various locations on the roof.
Finally, Noe is responsible for the reasonable cost of overhead and supervision in addition to a reasonable profit regarding the cost of repairing or replacing the various items he is charged with. The court finds 15 percent of those costs to be reasonable. ($15,553.35 x .15% = $2,333.00.)
The Glasers also claim that Noe damaged or removed CT Page 3864 certain of their property from the job site. The various items are set out in Rodriguez' report. However, as correctly indicated by Noe, other than such listing, virtually no evidence was offered to prove their claim. Consequently, the Glasers have failed to prove by a fair preponderance of the evidence that Noe is responsible.
The single largest item which the Glasers claim Noe constructed improperly is the driveway. Related to this is the claim that the house was improperly located.
It is Noe's position that Frank Saunders, Jr., his subcontractor, constructed the driveway and located the house and its elevation in accordance with the surveyors' stakes and at the direction of the Glasers and their agents. He contends that the Glasers' surveyors and engineers, Carroccio-Covill, should have noticed any mislocation or incorrect elevation of the house earlier. In his brief, he argues that "they were the defendants' experts. They said nothing." They certainly should have known in September of 1986 when the as-built plot plan was prepared about the house and driveway. "They were defendants' experts. They said nothing, neither did the defendants." He argues further that "because they didn't mention the driveway and didn't like the way it came out, the defendants are trying to blame Mr. Noe," and "they are even asking the court to award them the cost of landscaping when this was not included in the original contract."
Noe's argument is not very convincing. The evidence shows that the firm of Carroccio-Covill did survey and stake the house and driveway locations on the Glasers' property. (See Defendants' Exhibit 30.) In addition, they prepared a topographical map and marked a tree as an elevation bench mark. (Defendants' Exhibit 88.)
As indicated in the Glaser's brief, Howard Glaser testified that the stakes were left in place after tree clearing. Additionally, photographs in evidence show the staking both before and after clearing.
The court finds that in spite of the maps, stakes, and bench mark, the house and driveway were not located as mapped and staked. (Exhibits 33 and 34.) In addition to being improperly located, both the house and driveway failed to meet the specified grades. The house is located three feet below the intended grade and, as a consequence, the driveway, which was not to have grades in excess of 10 percent had grades up to 18 percent. (Defendants' Exhibit 22.) CT Page 3865
Noe claims that he was unaware of the elevation bench mark placed on the property by Carroccio-Covill and that Howard Glaser showed him the proposed elevation with his hand. As indicated in plaintiff's brief, "It defies credibility that Dr. Glaser would have hired engineers to survey, map and stake the property, only to determine elevations with hand signals."
The court further finds that as a result of improper siting and incorrect grading, the driveway suffered a severe drainage problem causing erosion and excessive water accumulation by the garage.
It is clear that the drainage problem was much more than a mere maintenance problem as argued by Noe. Furthermore, since the driveway was properly relocated, graded and drained, there have been no further problems with erosion, ruts or standing water.
The Glasers are entitled to the following damages in connection with the necessary relocation of their driveway, the proper grading and draining of same: engineering costs to Carroccio-Covill in the amount of $2,337.00 (Defendants' Exhibit 23); excavation costs to Backhoe Jack, Inc. in the amount of $24,800.00 (Defendants' Exhibit 24); relocation of underground electrical service by Warren Schomber in the amount of $490.00 (Defendants' Exhibit 26); relocation of cable service to Housatonic Cable in the amount of $94.50 (Defendants' Exhibit 27); and the cost of landscape gravel to fill and protect a drainage swale in the amount of $40.00; and $210.50, the cost of 8 railroad ties and 12 upright rounds to mark areas of drains and catch basins. (Defendants' Exhibit 25.) The court is unable to award the cost of labor to spread the gravel or install the ties or rounds since it received no evidence of the cost of same.
No further award is made to the Glasers regarding the cost of landscaping because Noe had no original contractual responsibility for same, and the court finds that he has none now.
In their third count, the Glasers allege that Noe charged them extra for construction in the basement, of a wine cellar and a cedar closet, although both were part of the agreed basic contract price.
Noe argues persuasively and the court finds, that the wine cellar referred to in the contract as a storage room and the closet are both basement rooms and that pursuant to paragraph 18 of their contract, basement rooms are not CT Page 3866 included in the contract price or allowance. Further, as Noe indicates, page 3 of the specification provides that the Glasers were to supply him with a basement plan which would include a storage room approximately 10' x 12' and a 7' x 12' cedar closet. (See plaintiff's Exhibit A.) This was not done so that the cost of constructing these rooms could not be included in the base price because he neither had plans for their construction, upon which to base his estimate, nor did he know where in the basement they were to be located. The location of these rooms could have considerable impact on their cost.
In accord with the foregoing, the court finds that the Glasers have failed to prove this claim.
In the fourth count of their counterclaim, the Glasers allege that Noe breached the contract by failing to complete construction of their residence by October 1, 1986.
Under the contract, Noe was obligated to "construct said residence in a good, skillful, substantial and workmanlike manner . . . [with] . . . proper materials of every description necessary for the completion of a first class building, all of which is to be in accordance with the Building Code of the Town of Newtown and State of Connecticut." (Plaintiff's Exhibit A, paragraph 1.)
Further, he was required to complete same by October 1, 1986 or "pay all reasonable costs incurred by the owner or as a result of any delay, including but not limited to, the cost of housing and storage." (Plaintiff's Exhibit A, paragraph 3.)
Although the above provision speaks in terms of completed construction, the parties treated same in terms of substantial construction sufficient to allow the issuance of a certificate of occupancy by the Town of Newtown. Such certificate was issued on January 13, 1987, three (3) months and thirteen (13) days beyond the contract completion date.
As Noe contends, two weeks of that delay can be and is attributed to the Glasers; however, the remainder is Noe's responsibility resulting from his failure to provide adequate supervision, failure to communicate with his subcontractor and failure to attend to the job in a diligent fashion, all as indicated earlier herein.
The Glasers claim to have incurred considerable expenses as a result of the delay, including $6,000.00 in rent for the months of October, 1987 through January, 1988. CT Page 3867 (Defendant's Exhibit 7 and 86.)
In accord with the foregoing, and after allowing Noe credit for the two weeks delay attributed to the Glasers, the court finds Noe responsible for $5,250.00 of the claimed $6,000.00. With regard to the balance of expenses claimed by the Glasers, the court finds that they have failed to prove by a fair preponderance of the evidence that they are reasonable costs resulting from the delay, and therefore are not assessed against Noe.
In the fifth count of their counterclaim, the Glasers claim that Noe breached paragraph 4 of the contract which in pertinent part provides:
Upon payment of the final installment, the contractor shall waive his right of lien in writing, but he will waive the priority of his lien to a first mortgage if required by the owner's lending institution prior to final payment.
On May 8, 1986, the Glasers obtained construction mortgage financing from the Connecticut Bank and Trust Company. The mortgage note required payment in one year so that refinancing to a fixed mortgage would become necessary in May, 1987. (Defendants' Exhibit 37.) On April 10, 1987, Noe filed a mechanic's lien against the Glasers' property. (Defendants' Exhibit 4.) On April 22, 1987, the Glasers requested, in writing, that Noe subordinate the mechanic's lien to a first mortgage to be secured by the premises. (Defendants' Exhibit 2.) This request was refused. Noe claims to have refused to grant such variance of priority because his lien was already subject to a first mortgage and the Glasers were in breach of the contract. However, Noe's position is neither supported by the plain language of the contract nor by the facts proven at trial.
As the Glasers state in their cogent argument, in order to properly interpret contractual language, the court must consider "the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." Connecticut Co. v. Division 425, 147 Conn. 608, 616 (1960). The court adopts the reasoning and conclusion reached by the Glasers in their brief as its own because it is clear that "the purpose of the contract was for the construction of a house upon real estate already owned by the Glasers. It is common practice for owners in such a circumstance to obtain short term construction financing and later refinance to a fixed long term mortgage. It can reasonably be assumed that paragraph 4 was drafted in anticipation of exactly this circumstance CT Page 3868 . . . . [and] [w]hen the Glasers intended to refinance, they would merely be substituting one mortgage for another. Thus, Mr. Noe's claim that his lien was already subject to a first mortgage is specious. Contractual language `. . . must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.' Barnard v. Barnard, 214 Conn. 99 (1990). In this case paragraph 4 was clearly written in anticipation of an owner obtaining post-construction fixed financing." (The Glasers' Brief, p. 17.)
The other basis for justification advanced by Noe for refusing to waive priority of his lien, as requested, is the claimed breach of contract by the Glasers. This claim was earlier considered and rejected by the court as unavailing.
In order to obtain permanent mortgage financing, the Glasers, as a result of Noe's refusal to subordinate, obtained a surety bond from Aetna and substituted same for the lien. Noe then released the lien on June 30, 1987. The Glasers paid Aetna the sum of $2,287.00 as premiums for the bond. (Defendants' Exhibit 5.) In accord with the foregoing, the court finds Noe responsible to the Glasers for this sum.
The Glasers also contend that Noe's refusal to subordinate his mechanic's lien interfered with their ability to obtain fixed low interest permanent mortgage financing.
Karen Glaser testified that the mechanic's lien prevented her from obtaining a fifteen year mortgage with a fixed interest rate of 10.75 percent and that when mortgage refinancing finally closed in September, 1987, it was for a thirty year adjustable rate mortgage with a starting rate of 7.5 percent.
The Glasers claim that their thirty year adjustable rate mortgage will cost them $161,660.90, more than the fifteen year fixed rate mortgage, and therefore look to Noe for that sum. They derive support for their position from the testimony of Joan Gabell, a private banking officer employed by Connecticut Bank and Trust at its downtown Danbury branch, during the period in question. In that position, she serviced customers, including the Glasers, and on occasion made recommendations to the mortgage underwriters regarding loan applications of her customers. In her opinion, but for the mechanic's lien encumbering their property, the Glasers would have qualified for a fifteen year fixed rate mortgage at the time their construction mortgage matured and had to be converted to permanent financing. CT Page 3869 Earlier, on May 8, 1986, the Glasers entered into a one year construction mortgage with Connecticut Bank and Trust. That mortgage was modified on May 8, 1987, to extend the term of the note to August 8, 1987. At the time of the modification, the Glasers' property was encumbered by Noe's mechanic's lien. Joann Gabell testified that, as a result, Connecticut Bank and Trust would not accept the Glasers' application for a fixed rate mortgage, but would allow them variable rate, thirty year term financing, called a portfolio mortgage. It was so-called because the mortgage was not to be sold, rather it was to be retained in house by the bank until the lien had been released.
On June 30, 1987, Noe's mechanic's lien was released, and on July 21, 1987, the Glasers made application to Connecticut Bank and Trust for a mortgage loan. The mortgage was closed on September 18, 1987. According to the testimony of Joann Gabell, the Glasers entered into a portfolio mortgage at that time, although its clear that the mechanic's lien had been released some six weeks earlier and that the shorter term fixed rate mortgage sought by the Glasers, while not available in September, was available during late July and early August of 1987. Perhaps, as suggested by Noe, the bank's delay in processing the Glasers' application had more to do with the type and terms of this mortgage then his lien did. Nevertheless, Joann Gabell computed the claimed difference in costs to the Glasers of the two mortgages. In order to accomplish this, she was required to make several unsupported assumptions. This included an assumption that the Glasers would not prepay the principal of their mortgage debt, in whole or in part, prior to maturity. Obviously, such whole or partial prepayment would have the effect of reducing the term of their mortgage thereby reducing the amount of interest otherwise payable. It should be noted that the Glasers' portfolio mortgage has no penalty for or restriction against prepayment, in whole or in part, at any time. (Defendants' Exhibit 38.)
In addition to the assumption that the Glasers would not refinance for more favorable terms during the life of their mortgage, or that they would not sell their property and satisfy the mortgage debt during the next thirty years, she assumed that the start up mortgage interest rate would not change during that period.
The court finds the Glasers' claim for $161,660.90 much too speculative and unsupported by a fair preponderance of the evidence, and therefore denies same.
In count six of their counterclaim, the Glasers allege CT Page 3870 that Noe, his employees, agents or subcontractors, negligently damaged and/or removed personal property of the Glasers from the job site. The various items are listed in Rodriguez' report. However, as correctly indicated by Noe, other then such listing, virtually no evidence was offered to prove their claim. Consequently, the Glasers have failed to prove by a fair preponderance of the evidence that Noe is responsible.
Finally, the court considers Noe's counterclaim filed in response to the Glasers' complaint.
The first of its two counts mirrors his complaint against them and has been considered and rejected earlier herein.
The second count makes a claim of unjust enrichment. After reviewing the evidence, the court finds that Noe is entitled to the reasonable value of labor and materials he furnished in the construction of the Glasers' home for which he was not paid. That sum is $32,979.97, and was arrived at as follows:
Subsequent to the commencement of the instant action, Randy Noe provided counsel to the Glasers with an itemized list of "extra" charges. (Exhibit E.) Although none of these charges were authorized in writing, the Glasers did verbally assent to some of these items. The extra charges accepted by the Glasers are as follows:
 Kitchen girder $78.00 Greatroom girder 180.00 Greatroom rafters 125.00 Sunroom steel 89.00 Cut skirt on hot tub 92.00 Move wall in master bath 90.00 Move wall in hall bath 110.00 Level off ceilings 80.00 Oil tank 550.00 Well pump 1,845.00 Smoke pipe 65.00 15% of accepted items ($3,304.00) 495.60 Shingles 3,200.00 Steel for glass block wall 69.00 Stones on flat roof 69.00 Replace broken glass 45.15 Replace French door panels 690.00 Replace astragal 85.00 Closet shelving and poles 1,184.00 Redwood benches 465.00 CT Page 3871 Pine midrails 45.00 Remove trash 75.00 Venting 450.00 Remove and reinstall French door 28.00 lever's Laundry cabinets 185.00 Bedford tile 50.00 15% of accepted items ($3,686.15) 552.92 Tile work over allowance 248.40 Oak floor over allowance 256.00 Water analysis 51.75 Sub-total of extras $11,548.82
In addition to the foregoing, the court finds from the evidence that the following extras from Exhibit E were authorized by the Glasers and that their respective charges are reasonable:
 Site work as of 8/22/86 $4,636.00 Windows and doors 5,730.00 E-glass for skylights 817.00 Spiral stair — 3 risers 260.00 Linen shelves 1,184.00 Wine cellar 910.00 Cedar closet 1,580.00 Underground drains for leaders 385.00 Railroad tie platform 290.00 Driveway apron 345.00 Frank Saunders 3,878.00 Rebuild box at top of kitchen column 95.00 Electrical work over allowance through 12/1/86 (less H.V.A.C. wiring) 10,261.79 Electrical work over allowance after 12/1/86 353.05 Sub-total of extras $30,724.84
In order to determine what, if anything, Noe is entitled to as and for the reasonable value of his labor and materials, the following computation is necessary:
 Total extras $42,273.66 Contract base price 233,705.00 Agreed allowances 92,030.00 Total extras, base price and allowances 368,008.66 Less agreed credits (Exhibit E) 30,574.00 Less credit for thermal under CT Page 3872 allowance (Exhibit A, specification page 9, item V.2. $24,256.00 less Exhibit kk and less 15%) 1,454.69 Less payment on account 303,000.00 Balance due Noe $32,979.97
In accord with the foregoing, the court finds the issues as follows:
On the complaint of Randy Noe, for Howard S. and Karen Glaser —
On counts one and two of this counterclaim, for the Glasers — $45,858.35 damages
On count three of the Glasers' counterclaim, for Noe —
On count four of their counterclaim, for the Glasers — $5,250.00 damages
On count five of their counterclaim, for the Glasers — $2,287.00 damages
On count six of the counterclaim, for Noe.
The Glasers, as prevailing parties in this consolidated action, are entitled to reasonable attorney's fees. The case took the better part of seven days to try and, in addition to excellent pretrial preparation by their attorney, she prepared a finely detailed post-trial brief. Therefore, in addition to awarding a sum equal to the fees billed for proceedings leading up to the release of the mechanic's lien, namely, $2,023.10; the court awards an additional $5,000.00, for a total award of $7,023.10 attorney's fees, together with costs.
As to the counterclaim of Randy Noe, the court finds as follows:
On count one, for the Glasers —
On count two, for Noe — $32,979.97 damages
Judgment may enter accordingly.
THOMAS G. WEST, JUDGE CT Page 3873