[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This post judgment matter comes before the court on the plaintiff's motion to open and modify judgment dated July 28, 1994 (No. 154), the plaintiff's motion for contempt dated July 28, 1994 (No. 155), the defendant's motion for modification dated September 15, 1994 (No. 156), and the defendant's objection to plaintiff's motion for modification dated September 15, 1994 (No. 157). CT Page 5865
As part of these proceedings, the parties have also requested that the court delineate or determine precisely what constitutes gross earnings/reasonable and necessary expenses pursuant to the terms of the May 18, 1983 judgment of dissolution.
The pertinent provisions of the original dissolution orders are as follows:
 [G]ross earnings (gross being defined as gross earnings less those expenses which are reasonable and necessary for the generation [of] the Husband's earnings, including reasonable expenses incurred away from home as a result of his employment and office expense incurred by any office maintained by him outside of his residence).
 In the event that alimony is still being paid on July 31, 1988 and the Wife has not remarried or cohabited as previously defined, then Husband shall pay to the Wife as alimony a sum equal to 20% of his gross earnings as previously defined, said payment to continue until the death of either party, the Wife's remarriage, her cohabitation as defined in the statute (which cause a modification, suspension or termination) or until December 31, 1994. Upon the happening of the first of those events, alimony shall cease and terminate or be suspended, modified or terminated as previously set forth. In the event, however, that the Wife has not remarried on December 31, 1994, alimony shall be reduced to $1.00 per year which shall be modifiable only in the event that the Wife is unable to work and support herself due to physical and/or mental disability.
 The Husband will furnish for the Wife medical insurance coverage equivalent to Blue Cross, Blue Shield and major medical. Said policy shall be maintained at the expense of the Husband. He will endeavor to continue the Wife on the current policy with Metropolitan, if available.
 The obligation of the Husband to continue to maintain medical insurance coverage for the Wife shall continue until such time as his obligation to pay alimony has terminated.
In October of 1992, the parties resolved, by stipulation, issues raised by two motions for contempt filed by the plaintiff dealing with arrearages allegedly due for alimony and support payments, the provision of medical insurance and the payment of medical bills. At that hearing, it was apparent that there was a dispute between the parties regarding their respective interpretation of the gross earnings/reasonable and necessary CT Page 5866 expenses provision of the dissolution judgment. Although that dispute was not resolved, the parties did stipulate to further orders regarding the provision of medical insurance and the payment of future medical bills which are relevant to these proceedings, specifically:
 [O]n the medical insurance the husband through his counsel will immediately make such arrangements as necessary to obtain for the wife medical insurance consistent with the original judgment that is CMS, Blue Cross, and Major Medical or the equivalent.
 And he will attempt to get insurance which will not have any areas that are — for which there is no coverage. Now, we have a specific agreement in reference to that coverage area. First of all, within the next sixty days the wife will incur no medical expenses that [are] elected in nature. No medical, no surgery, nor nothing of that nature.
 If the doctor requires something to be done, then she'll have to have it done and he is responsible for the bill. Once the insurance is in place, the understanding is going to be as follows. If, in fact, there is a disallowance under the medical insurance policy that is currently going to be put into effect for some finite period of time. One year, two years.
 The husband is going to be responsible for the medical bills . . . that are incurred for which these (INAUDIBLE) applicable. During that one or two years had he originally put the policy in place in '85, we wouldn't . . . have a disallowance in 1982. That's his responsibility.
 If, however, in 1985 Mrs. Materasso had a condition which could not have been insured, for a finite period of time in '85. Let's assume she had some condition, no company would insure her for, and they simply say, `We exclude that forever.' Much like one does with workmen compensation case. When you come on to the second child for a prior injury, then Mrs. Materasso understands that that is the medical bill for which he — he does not have to assume the responsibility and if we think he does, we have to come back to court and argue against what the judgment meant.
 In any event, if he couldn't get the insurance he can't do more than he could do. The — The year in question is the '85 year where the obligation arose.
CT Page 5867
 Mrs. Materasso has a claim pending involving the breast implant surgery. . . .
 [I]f Mrs. Materasso's payment, should she receive any, in that claim include compensation for medical bills incurred in the procedures for which Mr. Materasso is now making $32,000 in payments — or were perhaps. He will have a lean against her claim to obtain those funds.
 If, on the other hand, the federal judge or the state judge says, the law of this state requires us to exclude that because it's medical insurance claim, then he would have no such claim.
 [The defendant is] standing in the position of an insurer. In other words, in that New York litigation. So, in other words, rather than Blue Cross paying the bill, . . . [the defendant is] paying the bill. And [if] they would be reimbursed and . . . [the defendant] will also be reimbursed.
 With regard to . . . [the defendant's] responsibility for medical insurance coverage . . . we will get the best possible policy available. Blue Cross/Blue Shield was not available when . . . [the defendant] tried to [be] transferred back in 1985. The think [sic] that was available — the best insurance was this Health Re-Insurance which was in effect in 1986.
I. DEFINITION OF INCOME
The parties disagree as to what constitutes gross earnings and reasonable and necessary expenses pursuant to the terms of the original judgment.
The language in the judgment is taken from the parties' separation agreement.
A separation agreement "must be construed as a contract."Barnard v. Barnard, 214 Conn. 99, 109, 570 A.2d 690 (1990); Zivicv. Zivic, 26 Conn. App. 5, 7, 596 A.2d 475 (1991). A contract is to be construed as a whole and all relevant provisions will be considered together. Lar-Rob Bus Corporation v. Fairfield,170 Conn. 397, 407, 365 A.2d 1086 (1976). A contract must be interpreted to effectuate the intent of the parties, as determined by the language used by the parties, the circumstances surrounding the transaction, and the purpose the parties sought to accomplish. Id., 406, 407. "In interpreting contract terms, we CT Page 5868 have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Sturman v. Socha,191 Conn. 1, 10, 463 A.2d 527 (1983); Marcus v. Marcus, 175 Conn. 138,141-42, 394 A.2d 727 (1978).
The plaintiff in her testimony objected to basically all the deductions which the defendant claimed and also indicated that she feels that gross earnings should include the defendant's taxable interest.
The defendant's position in this regard is that the definition is limited to earned income and that appropriate deductions from those earnings are transportation costs, including auto insurance and depreciation, postage, etc., business telephone, one-half of his self-employment tax and one-quarter of his health insurance.
This court finds the common and ordinary meaning of the word "earnings" to be income (as wages, salary, professional fees or commission) that results from the personal labor or services of the defendant, as distinguished from the unearned income of the defendant from investments. In defining reasonable and necessary expenses for the generation of the defendant's earnings, the phrase "including reasonable expenses incurred away from home as a result of his employment and office expense incurred by any office maintained by him outside of his residence" does not prohibit or exclude, as reasonable and necessary, expenses for an office within his home.
Based upon the evidence, the court finds that with the exception of the depreciation figure, all of the expenses listed on Schedule C of the defendant's 1993 federal income tax return (Plaintiff's Exhibit 6) are necessary to the generation of the defendant's earnings and reasonable in amount. Those expenses include parking, tolls, inspection, maintenance repair and insurance of his business automobile, computer software, postage, supplies, subway and railroad fares, airport gratuities and 8 percent of the annual heat and electric bills at defendant's home. Depreciation is found not to be an expense for these purposes as it does not involve an actual cash expenditure or reduce the actual dollar income of the defendant. See Stoner v.Stoner, 163 Conn. 345 (1972). CT Page 5869
The defendant seeks to also include, as reasonable and necessary expenses for the generation of his business, the portions of his self-employment tax and health insurance premiums allowable as adjustments to income on lines 25 and 26 of federal income tax Form 1040. Although there is no question that these are payments actually made by the defendant and, in the case of the self-employment tax payments he is required by law to make, the court does not find that they are includable as expenses under the terms of this judgment. The common meaning of the term gross is an overall total, exclusive of or prior to deductions, such as taxes or expenses. The common meaning of the term net is that left after all deductions for taxes, charges, expenses, allowances and the like have been deducted. Here the parties have provided for the deduction of a limited category of expenses to be deducted to arrive at "gross earnings." Absent any specific reference to taxes in the parties' definition, this court will not characterize the self-employment tax as an expense under the terms of this judgment. With regard to the health insurance premium, the court finds that not to be an expense necessary for the generation of the defendant's earnings.
II. DEFENDANT'S MOTION FOR MODIFICATION
The defendant seeks a modification of his obligation to provide medical insurance for the plaintiff, alleging that the cost of said medical insurance is prohibitive based upon the plaintiff's lack of cooperation in obtaining such insurance. The court finds no evidence presented linking the cost of the medical insurance and the plaintiff's cooperation or lack thereof and, accordingly, denies the motion.
III. DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR MODIFICATION
This objection was filed in September of 1994, based upon the failure of the plaintiff to file a financial affidavit in accordance with section 463 of the Connecticut Practice Book. Based upon the evidence presented and the particularly thorough defense, including detailed cross-examination related to financial matters conducted by the defendant's counsel, the objection is overruled.
IV. PLAINTIFF'S MOTION TO OPEN AND MODIFY JUDGMENT
In this motion, the fifty-four (54) year old plaintiff CT Page 5870 requests that the court open the judgment and modify the $1.00 per year alimony claiming that she is unable to work and support herself due to physical and/or mental disability.
The plaintiff testified extensively in this matter regarding her health problems. Many of her current health difficulties stem from reconstructive surgery after her double mastectomy in 1971, approximately twelve (12) years prior to the parties' dissolution, requiring various subsequent surgeries, the most recent in 1993. She indicated that during the period from 1990 forward, her health has deteriorated. She now has carpal tunnel syndrome in both hands. As a result, she is unable to lift anything, blow-dry her own hair or change her own sheets. Although she wears hand braces for four out of five days, she is still in constant pain. She also suffers from thyroid problems and fibro myalgia, a disease of the soft tissue which specifically affects her neck, back and legs, which interferes with her ability to sleep, sit or stand for any prolonged period of time. The plaintiff also testified to her problems with disorientation, short term memory, dizziness, exhaustion, confusion, debilitating headaches, as well as the prescribed medications she takes on a regular basis to deal with her health problems.
The plaintiff's lay description of her ailments was supplemented and corroborated by the medical reports submitted.
The report of Lauren Broch, Ph.D., indicates that the plaintiff's symptoms suggest a primary sleep disorder such as sleep apnea syndrome, or narcolepsy. (Plaintiff's Exhibit 1.) Dr. Gerry Solomon of the Orthopedic Institute of the Hospital for Joint Diseases reports the numerous physical illnesses or ailments directly caused by the weakening of her silicone breast implants including connective tissue disease characterized by fatigue, cognitive disfunction, and other ailments. (Plaintiff's Exhibit 2.)
The neuropsychological evaluation of the plaintiff performed in September of 1994 indicates overall cognitive functioning in the average range but sustained attention to a task was well below average, immediate and delayed recall and recognition well below average, problem-solving ability below expectations with reduced cognitive efficiency. (Plaintiff's Exhibit 4.)
In July of 1994, Dr. Kenneth O. Miller reported that based CT Page 5871 upon the persistent symptoms of the previous eight months of chronic fatigue and diffuse musculoskeletal pain, he considers the plaintiff fully disabled for any gainful employment and does not anticipate a foreseeable change in the near future. He also notes a concern of a "significant" additional component of anxiety and depression contributing to her symptoms. (Plaintiff's Exhibit 3.)
Dr. Eric D. Moskow, who began evaluating the plaintiff in July of 1994 for chronic fatigue, confusion, memory loss, and mental status changes, concludes that she has severe memory loss and finds that her cognitive deficits are very significant and that she is severely impaired because of them. He states that her ability to work is also severely impaired because of these conditions so that it would be impossible, with her mental status and her current physical condition (weakness, inability to stand or sit for reasonable periods of time without pain, fatigue, joint pain, etc.) for her to be able to work in any environment that would have even the least bit of stress or require any degree of mental activities. In conclusion, he states that it is his opinion that the plaintiff is cognitively, psychologically and physically severely impaired, which would make her ability to maintain a job essentially impossible. (Plaintiff's Exhibit 5.)
Since the judgment of dissolution in 1983, the plaintiff's primary means of support was the alimony paid by the defendant. Her other sources of income have included some interest income, approximately four boarders who stayed for a few weeks to a few months, some occasional pet-sitting and a few short jobs house-sitting. The plaintiff currently shares her house with her daughter and her husband. Although they pay no rent they pay the utilities including oil, if needed. and generally take care of the premises which the plaintiff would otherwise have to hire outside help to do.
Although the plaintiff testified that she did not know what the rental value would be if she were to rent the space used by her daughter's family to the public, she also testified that the property was not zoned for two-family dwellings and hence she could not legally rent it out. At the time of the hearing, a friend and her daughter had been living in the plaintiff's spare bedroom for approximately two to three months, paying no rent, but the plaintiff testified that they cook for her. She estimated that they might remain for approximately six months or more. CT Page 5872
Based upon the evidence set forth above, which the court finds to be credible, that portion of plaintiff's motion which requests that the judgment be opened, is granted, the court finding that the plaintiff is unable to work and support herself at this time due to physical and/or mental disability.
The court has considered the statutory criteria including the ages and health of the parties, the amounts and sources of their income, their vocational skills, employability, estates and needs. Effective December 31, 1994, pursuant to the parties' stipulation of retroactivity, the defendant shall pay to the plaintiff 20 percent of his gross earnings (as previously defined) up to a cap of $30,000 per year, until the death of either party, the remarriage of the plaintiff or her recovery from total disability. At the time of the settlement of the plaintiff's pending negligence lawsuit, there shall be a review of this order.
To the extent that the insurance coverage now obtained by the defendant is not the equivalent of the Blue Cross/Blue Shield and major medical as required by the judgment, the defendant shall be responsible for and pay the portion of the plaintiff's medical expenses representing the differential between the current coverage and Blue Cross/Blue Shield and major medical coverage. These payments shall be deemed to be additional periodic alimony.
V. PLAINTIFF'S MOTION FOR CONTEMPT
In this motion, the plaintiff alleges that the defendant is in arrears in his alimony payments, that he has failed to provide her health insurance coverage and that he has failed to pay medical bills.
A. ALIMONY ARREARAGES
Based upon the delineation of gross earnings and reasonable and necessary expenses previously set forth, the court finds that the defendant's gross earnings for 1993 to be $176,588 calculated as follows, utilizing the figures from his 1993 federal income tax return (Plaintiff's Exhibit G): CT Page 5873
Gross receipts $182,450
Auto expenses (3,507)
Insurance (1,016)
Office expense (235)
Taxes and licenses (165)
Utilities (494)
 Other expenses (445) ------- $176,588
The defendant's alimony obligation for 1993 was $35,317.60. He has made payments of $33,667 toward that obligation leaving an arrearage of $1,650.60. The arrearage is ordered to be paid within one week. No contempt is found with regard to the alimony arrearage as there was a genuine dispute as to the calculation of income upon which the alimony was to be paid.
The defendant shall immediately provide to the plaintiff all pertinent documentation related to his 1994 income and within two weeks pay to the plaintiff any additional alimony due for 1994.
B. HEALTH INSURANCE
Pursuant to the dissolution judgment, the defendant was to furnish for the plaintiff, at his expense, medical insurance coverage equivalent to Blue Cross/Blue Shield and major medical. At the time of the dissolution, he had coverage through June of 1984 as part of his termination from his employment. He then obtained coverage for his former wife and his children on a family policy from another source. When he was notified that he could no longer carry his wife under the family policy, he obtained separate coverage for her through health reinsurance. In February of 1986, he made a quarterly premium payment in the amount of $585. No further premium payments were made by the defendant and the plaintiff's health insurance coverage lapsed. No further health insurance was provided for the plaintiff from 1986. This issue was brought before the court in the proceedings in October of 1992. Pursuant to the stipulation of the parties, no finding of contempt was made at that time; however, the defendant was to immediately thereafter make arrangements to obtain the best possible medical insurance for the wife, consistent with the terms of the original judgment. As of the date of this hearing, medical insurance was still not in effect. CT Page 5874 The court will not make a finding of contempt in this regard as there is credible evidence of an ongoing dispute between the parties as to responsibility for payments not covered by insurance proposed by the defendant in an attempt to satisfy the court order since October, 1992. As a result of these disputes, no application for insurance had been signed by the plaintiff and without that the insurance policy could not be issued.
The defendant is ordered to immediately obtain for the plaintiff, at his expense, the best possible medical insurance coverage, consistent with the terms of the dissolution judgment requiring the equivalent of Blue Cross/Blue Shield and major medical. This obligation shall continue so long as the defendant has an obligation to pay alimony. If there is any exclusion of coverage for pre-existing conditions, the defendant shall be responsible for the prompt payment of those necessary expenses, provided such would have been covered under the insurance required by the dissolution judgment. These payments shall not be deemed to be alimony. The defendant shall be entitled to be reimbursed for any such medical payments in accordance with the provisions regarding reimbursement set forth in the October 9, 1992 order.
C. UNPAID MEDICAL BILLS
In October of 1992, the parties appeared in court and stipulated to a settlement of existing medical bills. The parties agreed at that time to the defendant's responsibility for medical bills.
Possessed with the knowledge that the plaintiff had no health insurance in effect, the defendant made no payments for any medical expenses until December of 1994, when he made a $5,000 payment toward the medical bills.
The plaintiff's claims for medical bills total $20,486.62. (Plaintiff's Exhibits 7 and 8.) Included in that total are the following bills incurred prior to the October 9, 1992 stipulation, which the court finds should be excluded from the claims at issue. CT Page 5875
Town of Ridgefield $273.80 August 31, 1992
Westchester Hospital 89.00 May 24, 1992
Westchester Hospital 331.00 May 21, 1992
Danbury Internal Medicine 145.00 September 27, 1992
 Danbury Hospital 258.61 August 31, 1992 ------- $1,097.41
Also included in that total was a charge for $3,000, the anticipated cost for a sleep disorder procedure which, as of the date of the hearing in this matter, had not yet occurred.
The defendant is found to be in contempt for his failure to assume and pay his responsibility for the medical bills. He is ordered to pay to the plaintiff, within one week, the sum of $11,389.21 representing reimbursement for the medical bills reflected in Plaintiff's Exhibits 7 and 8, less the pre-October 1992 bills, and the $3,000 estimated cost of the sleep disorder procedure, allowing a credit for the $5,000 payment made in December of 1994. The defendant shall be responsible for the payment, or reimbursement to the plaintiff for her payment, for the costs incurred in the sleep disorder procedure immediately upon receipt of the invoice reflecting same.
The defendant shall be entitled to reimbursement for any payments applicable to the negligence action from the plaintiff's proceeds of the negligence claim in accordance with the provisions regarding reimbursement set forth in the October 9, 1992 order.
The court finds credible the plaintiff's claim that the interest expense on the portion of her medical bills, which she paid by credit card, exceeded $1,000 and, accordingly, the defendant is ordered to pay to the plaintiff the additional sum of $1,000 within one week.
VI. COUNSEL FEES
The plaintiff's counsel fees for the period April 14, 1993, up to and including three hours in court on January 18, 1995, total $7,725.50. (Plaintiff's Exhibit 11.) The court takes note that the proceedings extended into the afternoon of January 18, 1995, and that plaintiff's counsel expended time in preparation of his brief in this matter, finding the addition of seven hours or $1,750 to the fees as reasonable. Although it is impossible to CT Page 5876 assess with absolute precision what portion of the fees relates to the contempt proceedings versus the fees related to the modification proceeding (for which the court is not authorized to award fees), the court finds that $3,500 is a reasonable amount for the defendant to pay toward the plaintiff's fees incurred in connection with the contempt proceeding. Such payment shall be made by the defendant within one week of this order.
VII. ORDERS PENDING APPEAL
Plaintiff's counsel requests in his brief that the court enter a "Yontef order" requiring the defendant to comply with the orders entered herein during the pendency of any appeal of these orders. As none of this court's orders relate to the custody or care of minors, the court declines to make such an order in these proceedings. (See Garrison v. Garrison, 190 Conn. 173 (1983).)
Dennis, J.